Filed 1/12/18

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　v.<br><br>MICHAEL JOHN ALMEDA et al.,<br><br>　　　　Defendants and Appellants. | C077141<br><br>(Super. Ct. Nos.<br>13F00543 & 09F06819) |

APPEAL from a judgment of the Superior Court of Sacramento County, Ernest W. Sawtelle, Judge. Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Rodolfo Simon Villa.

Marcia Clark, under appointment by the Court of Appeal, for Defendant and Appellant Michael John Almeda.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through V.

1

Defendants Rodolfo Simon Villa and Michael John Almeda appeal from their convictions of first degree murder. They both contend the trial court erred by admitting evidence of Villa's jailhouse confession and by failing to instruct on the lesser included offense of voluntary manslaughter. Villa also contends the court erred by admitting uncharged offense evidence. Almeda further contends the court erred by denying his motion for severance. Both defendants assert cumulative error.

We affirm the judgments in their entirety.

FACTS

*Brandishing and shooting*

At approximately 4:00 p.m., January 17, 2013, Villa and Almeda approached three boys who were playing basketball at a park. They stood at the court and stared at the boys. An angry conversation ensured, and defendants displayed guns in their waistbands. Almeda pulled out his gun and held it at his side.

After the argument, defendants walked to an older model red car. Almeda pulled a gun out of the car. He entered the car on the driver's side, and Villa entered it on the passenger side. They drove away. No one else was with them.

At approximately 5:00 p.m. the same day, Alex Chavez and his girlfriend, Jacqueline Jones, left Chavez's home in a white Chevy Suburban. They went to the home of Jones's father, about a five-minute drive, where Jones told him she was pregnant.

From there, they drove to a nearby market, where Chavez purchased a bottle of beer. Then they began driving back to Chavez's home, with Chavez holding the beer bottle as he drove.

At a stop sign, Jones was looking out the passenger window when she heard the sound of a bottle breaking. She looked at Chavez, and saw out the window another car on the driver's side. Looking into the car, she saw Almeda in the driver's seat, looking at

2

Chavez. She thought she saw two other people in the car, one in the front passenger seat and another in the backseat on the passenger side.

Then she heard gunshots. Chavez told her to get down, and he pushed her down towards the floor. She went blank for a moment. When she awoke, the Suburban was moving forward slowly. Chavez was holding her hand. Then she heard two more shots. One of them hit Chavez in the head. His blood splattered all over her.

After Chavez was hit, his foot stepped on the gas pedal, and the car accelerated quickly. Jones climbed onto Chavez and stepped on the brake pedal, stopping the car. She looked out the window and saw Almeda in the driver's seat of his car slowly driving by and looking at the Suburban. She also saw a man in the passenger side. Then the car sped off.

Jones tried to revive Chavez, but he was unresponsive. The bullet struck Chavez at the top of his neck where it met the head. It transected his spinal cord. He likely died within a few minutes after being hit.

Jones's sister, Nicole, arrived at the scene, and Jones told her Almeda shot Chavez. When the sheriff's deputies arrived, Jones told them Almeda shot Chavez, and she showed them where Almeda lived. Later that evening at the sheriff's department, she told a friend by text message that Almeda shot Chavez.

When Jones met with detectives that night, she told them she thought Almeda shot Chavez, but she was not sure. She knew Almeda shot Chavez, but she was emotional and in shock, and she was not comfortable with the detectives and how they "came at" her. She also did not want to be called a snitch and she was worried about the safety of her family.

A few days later, Chavez's sister, Laura, showed Jones a picture of someone on Facebook, and Jones recognized the person as one of the other persons in the car that shot at her and Chavez. Laura told her the person was Villa. Jones cried when she saw Villa's and Almeda's pictures. Laura also showed Jones a picture of Isaiah Almeda,

3

defendant Michael Almeda's brother, on Facebook. Jones thought Isaiah was the third person in the car. Jones informed the detectives of Villa's and Isaiah's identities.

*Investigation*

Law enforcement collected evidence at the scene. They collected several .40-caliber shell casings. Four of those casings were fired from the same gun. Four bullet holes were found in the body of the Suburban. Police recovered a .40-caliber bullet fragment and a .38-caliber bullet fragment from inside the Suburban. The .40-caliber bullet fragment found in the Suburban and the .40-caliber bullet recovered from Chavez's body during an autopsy were likely fired from the same gun. The .38-caliber bullet could not have been fired from a .40-caliber weapon. It was most common to .38 special and .357 magnum ammunition.

Sheriff's deputies detained Isaiah the night of the shooting in a green Toyota Camry. Gunshot residue was found inside the Camry. That finding indicated either a weapon was fired near the vehicle or something contaminated with gunshot residue touched the vehicle.

Law enforcement searched Almeda's home. They discovered two live rounds (.9-millimeter and .762-caliber) and an expended shell casing (.357-caliber) in Isaiah's room.

*Villa's jailhouse confession*

Jeremy Rhodes was Villa's cellmate in the Sacramento County Jail while Villa awaited trial. They were cellmates for several months beginning in 2013. Rhodes admitted to several prior felony convictions and, at the time of trial, was waiting to be sentenced on an armed robbery conviction.

While they were cellmates, Villa explained to Rhodes why he was in custody. Rhodes, in turn, believed he could use that information to assist himself in his case. He approached a deputy at the jail and told him he had information about a murder case. He then had contact with the prosecutor and an investigator from the district attorney's office

4

and related to them Villa's admissions. He ultimately received a four-year reduction in his sentence for the information he provided.

At trial, Rhodes recreated a map Villa drew for him while he was explaining the shooting. Villa was defendant Michael Almeda's cousin.[1] He told Rhodes he and Michael Almeda were in Almeda's car at the time of the shooting, a cheap early to mid-1990's burgundy Cavalier. Villa called it a "scraper," meaning it was a "low budget" car. Almeda drove, and Villa rode in the passenger seat. Two other people were in the car, but Villa did not tell Rhodes who they were.

They drove down a street that had two speed bumps on it. (Villa drew the speed bumps on his map.) At a stop sign, Villa saw a white Tahoe or Suburban SUV that looked familiar, so he told Almeda to turn around and pull up to it. As soon as they pulled up to the side of the SUV, something hit their car. Villa started shooting at the driver of the SUV. He used a .40-caliber Glock. His gun jammed after about two or three shots. The SUV pulled forward slowly, and Villa told Almeda to pull up to it again. Villa got his gun unjammed, and he fired a second volley of shots. But his gun jammed again. Then Almeda started shooting with a .357 magnum. After Almeda fired two or three shots, they drove off.

They drove to Almeda's grandmother's house near Hiram Johnson High School. On the way, Almeda called his mother, who was at his grandmother's house, and asked her to open the garage. They pulled into the garage. They noticed a helicopter in the air patrolling the area and started hearing police, so they left in the car and drove to the home of another cousin of Villa's. They left the car there.

---

[1]     Villa referred to Almeda by his first name, Michael.

Almeda's mother followed Almeda, Villa, and the other two people to Villa's cousin's house in her car.[2] From that house, she gave them a ride to a friend's home. Villa called his sister to come pick up the guns. He waited outside for his sister, but she drove by and missed him. The group of four then made their way to an apartment on Florin Road between Stockton Boulevard and Power Inn Road where Villa, his girlfriend, and his sister were staying. Villa told everyone to strip down to their underwear, urinate in a bucket, and scrub themselves with the urine to get the gun residue off their bodies. Villa gave the .357 magnum to his brother, Manuel, who came to get him, but he kept his Glock.

Villa also told Rhodes about a shooting that occurred the day before the Chavez murder. Villa said he was dropping a few friends off when someone pulled in behind him and started shooting at his car. He shot back, using the same .40-caliber gun he used the next day against Chavez. Afterward, he blew up the car he was driving, a silver Chevy HHR, because it had bullet holes, and he did not want it to come back on him. Rhodes initially thought Villa used the HHR in the Chavez shooting, but at a later date, Villa said they were in Almeda's red "scraper" car at the time of the murder.

Almeda called Rhodes as a defense witness. Rhodes said Villa told him he and Almeda believed Chavez intended to engage in a drive-by shooting on Almeda's house, but he hit the neighbor's house by mistake. Rhodes told the investigators Villa said "that dude threw a bottle like he heard—that he thought that—you, know, you were shooting something and bam, bam, bam."

On cross-examination, Rhodes said Villa told him he and Almeda were "hunting" for Chavez because they thought he was responsible for a drive-by shooting at Almeda's home. Villa said when his gun jammed a second time, he told Almeda to "just shoot

---

[2] Isaiah Almeda testified for the defense that his mother's car was a green Toyota Camry.

6

him." Villa also said no shooting came from the victim's car. Villa and Almeda did the only shooting. Villa never said Chavez fired a gun.

*Other Evidence*

1.    *Prior encounter between Chavez, Jones, and defendants*

In December 2012, the month prior to Chavez's murder, Chavez and Jones encountered Villa and Almeda at a 7-11 store. Chavez and Jones were in the Suburban, and, as Chavez was backing up, Villa looked at Chavez and lifted his shirt like he was pretending he had a gun. He and Almeda got into a car. Jones did not know who the two were at the time. Chavez identified Almeda to her, but he did not know the other person.

Defendants followed Chavez as he drove to his home. Chavez sped up, but Almeda and Villa came up beside him. Seated in the passenger seat, Villa was smiling and flipping off Chavez and Jones with both hands. It appeared to Jones that Almeda was trying to hit them with his car. Defendants turned away as the two cars drove closer to Chavez's house. Chavez and Jones did not call the police to report the incident.

2.    *January 16, 2013 shootout*

On January 16, 2013, the day before Chavez's murder, Sacramento police responded to a report of shots fired. They found multiple spent casings, both .40- and .45-caliber, on different corners of a street intersection. Six of these .40-caliber casings were fired from the same gun that fired the four .40-caliber casings recovered from the Chavez murder scene the next day.

In an interview on January 23, 2013, while in custody, Villa admitted he was involved in the January 16 shootout, but he said he was the victim. At the time of the interview, Villa had just been released from the hospital, and he "vehemently" expressed his desire to talk about an incident where he was the victim. At first he claimed his car had been set on fire by a group of men. When challenged by detectives, he changed his story and said he had been involved in a shooting. While he was driving his mother's "HHR/PT Cruiser-type" car, an SUV pulled up behind him and people in the car started

7

shooting at him. He returned fire. He said he used a Barretta nine-millimeter. At first he said he did not pick up his casings and did not use a brass catcher. When police told him only .40- and .45-caliber ammunition was found, Villa said he had a brass catcher on his gun.

His mother's car sustained numerous gunshots, so he parked it in his family's driveway and covered it with a tarp. Two days later, he drove it to an alleyway and attempted to burn it. The car exploded or the fire blew him back, burning his face.

### 3. *Destruction of red car*

Almeda's father, also named Michael Almeda, sometimes helped a man who rented part of an auto body shop from John Cazares. Cazares knew Almeda was connected to a mid-90's Lumina or Corsica. The car was "beige/red" and "oxidized." Sometime in 2013, Cazares came back from a trip and saw Michael Almeda (father) and another person cutting up that car in the shop.

### 4. *Uncharged offense*

On September 3, 2009, Villa pointed a gun out the driver's side of his vehicle and shot at a truck driven by William Klaus. Klaus's passenger sustained multiple injuries that were consistent with a shotgun blast or a pellet gun. Villa pleaded no contest and was convicted of shooting at an occupied vehicle. (Pen. Code, § 246.)

### JUDGMENT AND SENTENCING

A single jury found both defendants guilty of first degree murder. (Pen. Code, § 187, subd. (a).) It also found true a special circumstance that the murder was intentional and perpetrated by discharging a firearm from a vehicle (Pen. Code, § 190.2, subd. (a)(21)), and an enhancement that defendants were armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). In a bifurcated hearing, the trial court found true a prior serious felony conviction allegation against Villa (Pen. Code, §§ 667, subds. (b)-(i); 1170.12).

8

The court sentenced each defendant to a prison term of life without the possibility of parole for the murder conviction with a special circumstance, plus one year for the arming enhancement. The court sentenced Villa to an additional five-year term for the prior conviction.

DISCUSSION

I

*Admission of Rhodes's Testimony*

Both defendants challenge the admission of Rhodes's testimony regarding Villa's jailhouse confessions. Villa contends admitting the evidence violated his Sixth Amendment right under *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246] (*Massiah*). *Massiah* prohibits admitting statements the government deliberately elicits from a defendant without counsel present after the right to counsel attaches. Villa claims Rhodes was a government agent through whom the government deliberately elicited Villa's incriminating statements. Almeda joins in Villa's argument under *Massiah*.

Almeda further contends (1) admitting the testimony violated his Sixth Amendment rights because the statements were testimonial and unreliable, and (2) the testimony was not admissible as statements against penal interest because it was untrustworthy.

We conclude the trial court did not abuse its discretion admitting Rhodes's testimony. There was no *Massiah* error, as there was no evidence showing Rhodes acted under government direction and pursuant to an existing agreement with the government. There was no Sixth Amendment error, as Villa's statements to Rhodes were not testimonial. And Rhodes's testimony was sufficiently reliable to be admitted as a statement against Villa's penal interest.

9

A.      Massiah *objection*

1.      *Background information*

Villa moved pursuant to *Massiah* to exclude Rhodes's testimony of Villa's statements made while they were cellmates.[3]  The court convened an Evidence Code section 402 hearing on the *Massiah* motion.

Sacramento County Deputy Sheriff Marcos Camacho was working in jail intelligence at the time.  He testified the jail intelligence unit does not ask inmates to provide information on other inmates.  It also does not have any official informants.  If an inmate offers to share information, unit personnel will take down the information and forward it to the detective handling the case.  The unit does not keep files or written reports of any such contacts by inmates.

Deputy Camacho contacted the prosecutor after Rhodes asked to speak with jail personnel.  Rhodes wanted to provide information about Villa.  He also wanted to cut a deal and get a reduction in his sentence.  Rhodes told Deputy Camacho he knew everything about Villa's case, but he would not give any details to Deputy Camacho.

Deputy Camacho never approached Rhodes or asked him to provide information on Villa.  Deputy Camacho never interviewed Rhodes to find out the information he had on Villa.  He was not involved in obtaining any further information from Rhodes, nor did he participate in any interviews with Rhodes.  He made no promises to Rhodes that he would get a deal in his case or offer him a deal if he would provide information.

Deputy Camacho said there was no effort made by jail intelligence personnel to insure Rhodes and Villa continued to live in the same cell.  He had no knowledge that anyone choreographed Rhodes's and Villa's cell movements to keep them together as cellmates.  He also said it was common for cellmates to move together to different cells.

---

**3**      Almeda did not join the *Massiah* motion, but he argued in favor of it.

10

Rhodes became an inmate at the Sacramento County Jail on May 10, 2012. He testified in the section 402 hearing that the first time he met Villa was when they were made cellmates, about 16 months after he entered the jail. About four months later, Rhodes contacted the jail deputies and told them he had some information on Villa's case. No one at the jail contacted him and asked for information in exchange for a reduction in his sentence.

Rhodes testified he did not prompt Villa to talk. They "just talked. Just basic gossip talking." Villa "opened up" to him. Sometimes the two would "just look out the window and just start talking about certain things, and then it detoured back to the case." Until this incident, Rhodes had never provided information to law enforcement.

Rhodes met with the prosecutor and her investigator on August 29, 2013. He asked them if he could get a reduced sentence. They entered into a so-called "queen-for-a-day" agreement, agreeing that nothing Rhodes said would be disclosed unless he waived disclosure by subsequent contract, provided exonerating or mitigating information, or provided information about threats to persons law enforcement had a duty to inform. This agreement expressly stated that no other promises or agreements were entered into at that time.

At the end of the meeting, the prosecutor explained the interview was confidential. She would talk with Rhodes's counsel, but no reports or disclosures would be made unless they eventually agreed to a contract with him. She said after counsel talked with each other, they would "see where we go from here."

Rhodes asked if there was anything else they wanted him to ask Villa. The prosecutor said, "No." The investigator said if Villa volunteered anything, Rhodes could listen like he had done. But the prosecutor told him, "Don't try and pry. If he tells you something that's fine, but, you know, I don't want to get you in a situation where you have any issues with him." After this first meeting with the prosecutor and investigator, Rhodes did not know if there would be a second meeting.

11

Through his attorney, Rhodes signed a subsequent "contract," i.e., a plea agreement, on November 4, 2013, that included the possibility of a reduced sentence. The prosecution agreed to move to reduce his sentence if he was asked to testify against Villa and was determined to have testified truthfully and cooperated fully. The plea agreement did not direct Rhodes to do anything regarding his contacts with Villa.

Rhodes met with the prosecutor and her investigator a second time on November 7, 2013, and relayed more information. He had not asked Villa any questions based on a request from the prosecutor or the investigator. According to the meeting's transcript,[4] the prosecutor and the investigator did not give Rhodes any type of assignment or request him to ask Villa more questions or get more information.

The prosecutor's investigator met with Rhodes a third time on January 20, 2014, while transporting him. Again, the investigator did not ask Rhodes to get more information from Villa.

Neither Villa nor Almeda argued at trial to exclude the first statement Rhodes gave to the prosecutor and the investigator under *Massiah*. They did, however, seek to exclude his second and third statements under *Massiah*.

The trial court denied the *Massiah* motion. It ruled neither Villa nor Almeda had presented evidence showing Rhodes acted under the direction of the government pursuant to an existing agreement. Deputy Camacho did nothing to indicate there was an agreement with Rhodes or to suggest or ask Rhodes to get more information from Villa. Deputy Camacho did not put the two men in the same cell to get information from Villa.

The court concluded the prosecutor and the investigator did not direct Rhodes's actions. In the first meeting, they listened. There was not even a trace in the transcript suggesting they were directing or telling Rhodes what to say. And, responding to

---

**4**    Audio recordings and transcriptions were made of all three meetings between the prosecutor, her investigator, and Rhodes. Both defense counsel had copies.

12

Rhodes's question of whether there was something they wanted him to ask Villa, the prosecutor told him there was not. They told him to listen, not to pry, and not to get in a situation where he might get hurt. They ended the interview without extending any promise to him. In the second and third meetings, they did not suggest or ask Rhodes to do anything.

The court saw no evidence "that would even remotely suggest that the government was involved in any way in directing him to do anything." None of the evidence suggested the court could infer the parties even thought there was an ongoing agreement to gather incriminating information.

### 2. *Analysis*

In *Massiah*, "the high court held that once a judicial proceeding has been initiated against an accused and the Sixth Amendment right to counsel has attached, any statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant. ([*Massiah, supra,* 377 U.S.] at pp. 206-207; *In re Neely* (1993) 6 Cal.4th 901, 915.) To prevail on a *Massiah* claim, a defendant must show that the police and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364]; *People v. Jenkins* [(2000)] 22 Cal.4th [900,] 1007.) 'Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements.' (*Neely, supra,* at p. 915.) The requirement of agency is not satisfied when law enforcement officials 'merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance.' (*Ibid.*) A preexisting arrangement, however, need not be explicit or formal, but may be inferred from evidence of the parties' behavior indicative of such an agreement. (*Ibid.*) A trial court's ruling on a motion to suppress

13

informant testimony is essentially a factual determination, entitled to deferential review on appeal. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247-1248.)" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66-67.)

The trial court did not abuse its discretion by concluding no evidence established Rhodes was an agent of the government when Villa spoke with him. Nothing in the record shows Rhodes acted under the direction of the government pursuant to a preexisting agreement. Deputy Comacho did not request or ask Rhodes to do anything, nor did he offer any kind of agreement to Rhodes for the information he would provide. He did not interview Rhodes, nor did he take action to ensure Rhodes and Villa would remain cellmates.

Furthermore, the prosecutor and her investigator did not suggest or ask Rhodes to take any action pursuant to an agreement. The interview transcripts record no suggestion or request, much less a directive or command, by the prosecutor or the investigator to Rhodes, nor do the two agreements Rhodes executed contain any directive or command for Rhodes to take any action except to testify truthfully. When Rhodes asked if there was something they wanted him to ask Villa, the prosecutor unequivocally said there was not. They told Rhodes that *if* Villa volunteered anything, he could just listen, but he was not to risk his safety. The government did not direct or command Rhodes to take any action.

Villa contends the record shows otherwise, asserting the evidence shows "a de facto agency relationship between Rhodes and the government" resulted from the first interview and their relationship from that time forward. He asserts an agency relationship can be implied because the prosecutor told Rhodes he would not be moved from his cell with Villa, and the prosecutor did not tell him to avoid initiating or stimulating any conversation with Villa about the case in any of the interviews. This, Villa argues, shows the government effectively placed him in the cell to exploit the opportunity to question

14

him without counsel. Indeed, he asserts the government implicitly deputized Rhodes to coax information from him by telling Rhodes to be careful.

Villa claims the second interview confirms the government and Rhodes behaved as if there were an agency agreement created in the first interview. During the first interview, the prosecutor's investigator asked Rhodes a series of questions regarding the car Almeda drove at the time of the murder. After that interview, Villa claims, Rhodes set up Villa to elicit information about that car, its color, and its disposal. When Villa veered off topic, Rhodes would steer the conversation back to the car. Villa contends this type of questioning "was the functional equivalent of a secret interrogation using police-type investigatory techniques." He also claims the continued questioning of Villa in the third meeting shows the government was invested in continuing contact with Rhodes as an informant.

While Rhodes may have solicited incriminating statements from Villa, that alone is insufficient to establish *Massiah* error. Villa must also show Rhodes solicited information under the government's direction and pursuant to a preexisting agreement. The evidence on which he relies does not establish this element of the error.

The prosecutor did not tell Rhodes he would not be moved from his cell with Villa. When Rhodes asked at the end of the first interview if they were "just gonna like randomly move" him, the prosecutor said it was as if the interview they had just finished did not happen. The investigator told him this would be treated as a normal day. Neither of them addressed whether Rhodes would be moved from his cell. They implied any move would occur based on normal jail procedures. Neither this nor any other evidence proves the government intentionally placed Rhodes in Villa's cell with the purpose to obtain more information.

Villa faults the government for not "reigning in" Rhodes or directing him to avoid raising the case with Villa. However, any such actions by the government would have demonstrated Rhodes was its agent. That the government did not direct Rhodes indicates

15

Rhodes was not its agent. Whatever Rhodes did was not at the direction of the government. The evil addressed by *Massiah* in no way precludes prosecutors and peace officers from harvesting low hanging evidentiary fruit.

In any event, even if admitting evidence from the second and third interviews was error, the error was harmless. We have no reasonable doubt that the jury, had it heard only Rhodes's testimony from the first interview and Jones's testimony, would still have convicted Villa of first degree murder. In the first interview, Rhodes informed the government that, according to Villa, Almeda and Villa had a "beef" with Chavez and his "cats" because they "did a drive by" on Almeda's home. Almeda and Villa came upon a Suburban. Almeda was driving at the time. Villa said the Suburban looked familiar, and he told Almeda to pull up on it. As he did, the victim threw a bottle or something at the car. Villa shot back two or three times. His pistol jammed. The Suburban started driving off slowly, so Villa told Almeda to pull up on it again. As they did, Villa started shooting again, and his gun jammed again. When it did, Almeda reached by Villa and shot at, but missed the victim. Villa felt the concussion from Almeda's gunshots. Then they drove off. Villa told Rhodes he used a .40-caliber Glock 23.

These admissions, along with Jones's eyewitness testimony and the other evidence, establish Villa, after he unjammed his gun the first time and directed Almeda to drive up on the Suburban again, killed Chavez willfully, deliberately, and with premeditation and malice. Any error in admitting Rhodes's testimony from his second and third interviews with the government was harmless regardless of the standard of review. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]; *People v. Watson* (1956) 46 Cal.2d 818.)

B.     *Testimonial nature and reliability of statements*

1.     *Background information*

Prior to trial, Almeda moved to exclude Rhodes's testimony of Villa's statements, contending the statements violated his Sixth Amendment rights because they were

16

testimonial and unreliable, and they were inadmissible as statements against penal interest to the extent they were not specifically disserving to Villa. Almeda concedes Rhodes's statements made during his first meeting with the prosecutor were not testimonial, but he claims the other two statements were testimonial. Nevertheless, he argues the statements from the first interview were inadmissible because they were unreliable, and that statements from all three interviews were inadmissible as statements against penal interest because they were unreliable and key aspects of them were not truly against Villa's interest.

The trial court rejected Almeda's argument. It ruled it first had to determine if the statements were testimonial before it could address their reasonableness. On that point, it found the statements were not testimonial, and thus did not violate the confrontation clause, because Villa gave them without expecting they would ever be used against him. The court also found the statements were reliable and could be introduced unredacted against both defendants as statements against Villa's penal interest.

2. *Analysis*

a. *Confrontation Clause*

Almeda claims admitting Rhodes's testimony violated his rights under the Sixth Amendment's confrontation clause because Villa's statements to Rhodes were unreliable and testimonial. Almeda reaches back to *Lilly v. Virginia* (1999) 527 U.S. 116 [144 L.Ed.2d 117] (*Lilly*), to argue the testimony was inadmissible against him under *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*) because it was not sufficiently reliable. He argues Villa's statements were not reliable because Rhodes lacked credibility.

Almeda's argument is not legally valid. Reliability is no longer the touchstone for determining violations of the confrontation clause. For that, we first look to see if the hearsay statements are testimonial as defined by *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) and its progeny. If a statement is not testimonial,

17

" 'it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule.' " (*People v. Arceo* (2011) 195 Cal.App.4th 556, 573.) "The threshold question in every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application.' ([*Whorton v.*] *Bockting* [(2007)] 549 U.S. [406,] 420 [167 L.Ed.2d 1, 13].)" (*U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85.)

This rule shortened the reach of *Bruton* and its state analogue, *People v. Aranda* (1965) 63 Cal.2d 518, 530-531 (*Aranda*).[5] In *Bruton*, the Supreme Court held introducing a nontestifying codefendant's confession implicating the defendant in a joint trial violated the right of cross-examination secured by the confrontation clause, even if the jury was instructed to consider the confession only against the codefendant. (*Bruton, supra,* 391 U.S. at p. 137.) However, because it is premised on the confrontation clause, " 'the *Bruton* rule, like the Confrontation Clause itself, does not apply to non-testimonial statements.' " (*People v. Arceo, supra,* 195 Cal.App.4th at p. 571, quoting *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326.)

*Bruton* is " 'simply irrelevant in the context of nontestimonial statements' made 'to a cellmate in an informal setting.' " (*U.S. v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378, quoting *U.S. v. Dargan* (4th Cir. 2013) 738 F.3d 643, 650-651.) "*Bruton* is no longer applicable to a non-testimonial 'prison yard conversation' because '*Bruton* is no more than a by-product of the Confrontation Clause.' " (*U.S. v. Vasquez, supra,* 766 F.3d at p. 378, quoting *U.S. v. Berrios* (3d Cir. 2012) 676 F.3d 118, 128; accord, *U.S. v. Rodriguez* (11th Cir. 2015) 591 Fed.Appx. 897, 902; *Smith v. Chavez* (9th Cir. 2014) 565 Fed.Appx. 653, *U.S. v. Clark* (10th Cir. 2013) 717 F.3d 790, 816; *U.S. v. Dale* (8th Cir.

---

[5] To the extent *Aranda* "require[d] the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

18

2010) 614 F.3d 942, 958-959; *U.S. v. Figueroa-Cartagena, supra,* 612 F.3d at p. 85; *U.S. v. Pike* (2d Cir. 2008) 292 Fed.Appx. 108, 112.)

There can be no dispute Villa's statements to Rhodes were not testimonial. "[S]tatements made unwittingly to a Government informant" and "statements from one prisoner to another" are nontestimonial statements. (*Davis v. Washington* (2006) 547 U.S. 813, 825 [165 L.Ed.2d 224, 239].) Because they were not testimonial statements, *Bruton* does not apply here.

Almeda tries to get around this roadblock by arguing "even though a statement is deemed non-testimonial, where a jailhouse informant with no independent ties to a declarant is involved, a higher level of reliability must be shown to overcome the concerns of the Confrontation Clause." Almeda cites no authority for this argument. What authority exists defeats it. *Crawford* "eliminat[ed] Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements. Under [*Ohio v. Roberts* (1980) 448 U.S. 56 (65 L.Ed.2d 597), relied upon by *Lilly* and abrogated by *Crawford*], an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability." (*Whorton v. Bockting, supra,* 549 U.S. at p. 420.) The confrontation clause and *Bruton/Aranda* did not prohibit the trial court from admitting Rhodes's testimony.

b.      *Declaration against penal interest*

Failing to establish a violation of the confrontation clause, Almeda contends the trial court erred in admitting Villa's statements to Rhodes because they did not qualify as statements against penal interest, a statutory exception to the hearsay rule. (Evid. Code, § 1230.) Almeda challenges the court's admission of Villa's statements that specifically inculpated him; specifically, that there had been a previous drive-by shooting at Almeda's house, Almeda was the owner and driver of the car used during the Chavez

19

shooting, and Almeda fired shots at Chavez. We conclude the trial court did not abuse its discretion in concluding Rhodes's testimony was reliable and admitting the statements under the circumstances presented here.

In California, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Pen. Code, § 1230.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)

This exception to the hearsay rule is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441, fn. omitted.) Stated somewhat differently, the exception does not apply "to collateral assertions within declarations against penal interest." (*People v. Campa* (1984) 36 Cal.3d 870, 882.) For example, a hearsay statement " 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*Duarte, supra,* 24 Cal.4th at p. 612.)

However, statements by a nontestifying codefendant that implicate the defendant, even by name, may be admissible if they are disserving to the codefendant's interest and are not exculpatory, self-serving, or collateral. In *People v. Cortez* (2016) 63 Cal.4th 101 (*Cortez*), the Supreme Court held a nontestifying codefendant's out-of-court statement that he and the defendant jointly engaged in a drive-by shooting, and defendant did the driving, were admissible in their joint trial as statements against the codefendant's penal interest. The statements established the codefendant's premeditation and implicated him

in a conspiracy. They also increased the likelihood that police would find evidence connecting him to the shooting. (*Id*. at pp. 126-128.)

The Supreme Court disagreed with the defendant's argument that the codefendant's out-of-court identification of the defendant by name was not specifically disserving of the codefendant's interest. It held a court could determine whether a statement was against a declarant's penal interest only in light of the surrounding circumstances, and that in the context before it, the codefendant's statements identifying the defendant by name disserved the codefendant's interest in several respects. (*Cortez, supra*, 63 Cal.4th at pp. 126-128.)

For its premise, the high court relied on the United States Supreme Court's application of the federal hearsay exception in *Williamson v. United States* (1994) 512 U.S. 594 [129 L.Ed.2d 476], which states: " '[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but *if it is likely to help the police find the murder weapon,* then it is certainly self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that *being linked* to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that *give the police significant details about the crime* may also, depending on the situation, be against the declarant's interest. The question . . . is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.' [Citation.]" (*Cortez, supra,* 63 Cal.4th at p. 127, quoting *Williamson v. U.S., supra,* 512 U.S. at pp. 600-601, original italics & italics added, fn. omitted.)

21

Applying this test to the facts before it, the *Cortez* court found the codefendant's out-of-court identification of the defendant disserved the codefendant's interest in several respects. When he made the statement, he knew the defendant and her car were already in police custody. By identifying the defendant, he increased the likelihood police would find evidence connecting him to the shooting. In fact, police found on the floor of the passenger side of defendant's car a live round matching the caliber and brand of several found at the scene. (*Cortez, supra,* 63 Cal.4th at p. 127.) The codefendant also knew that linking himself to the defendant would implicate him in a drive-by shooting for which the defendant had been arrested. (*Ibid.*)

Moreover, nothing in the surrounding circumstances undermined the conclusion that the codefendant's statements truly disserved his interest. The portions that implicated the defendant were not exculpatory or self-serving. The codefendant consistently assigned the most blame to himself by admitting he was the shooter, and he never attempted to shift blame to the defendant. Also, the context in which the codefendant made the statements—a conversation with a close family member in an apartment he frequented—did not suggest the defendant was trying to improve his position with the police. The setting was one which promoted truthfulness. Given the totality of the circumstances, the Supreme Court held the trial court did not abuse its discretion admitting the nontestifying codefendant's statements in the joint trial as statements against penal interest. (*Cortez, supra,* 63 Cal.4th at p. 128.)

In an earlier case, *People v. Samuels* (2005) 36 Cal.4th 96 (*Samuels*), the Supreme Court reached a similar conclusion. Although the case did not involve an out-of-court statement by a codefendant, it illustrates application of the hearsay exception for statements against penal interest that implicate others by name. In *Samuels*, the high court upheld as a statement against penal interest the deceased declarant's out-of-court statement that the defendant paid him to kill the defendant's ex-husband. Even though the statement named the defendant, it was admissible because the admission, volunteered

22

to an acquaintance, "was specifically disserving to [the declarant's] interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of [the declarant's] precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id*. at p. 121.)

Applying the tests required under *Cortez* and *Samuels*, we conclude the trial court did not abuse its discretion admitting Villa's statements that named Almeda. Viewed in their context, the statements Almeda challenges were all disserving to Villa's interest and were not exculpatory, self-serving, or collateral. Villa's statement that there had been a previous drive-by shooting at Almeda's house was disserving to Villa because, under the circumstances, it established his motive and indicated he was part of a conspiracy to kill Chavez. Villa told Rhodes he and Almeda believed Chavez was the person who shot at Almeda's house. The statement thus explains why he and Almeda were hunting for Chavez. It explains why Villa, upon seeing Chavez in the Suburban at the 7-11 store a few weeks before the shooting, lifted his shirt towards Chavez as if he had a gun and flipped off Chavez and Jones while he and Almeda were following them. It explains why Villa, upon seeing the Suburban again and recognizing it, told Almeda to pull up beside it. And it explains why Villa continued shooting after his gun jammed and unjammed the first time. It incriminated Villa and offered no exculpatory excuses or self-serving rationales.

Villa's statement that Almeda was the owner and driver of the car they were in was inextricably tied with Villa's statements and disserving to him. It explained how the shooting occurred and showed Villa was the person in the more culpable role. He was the one who told Almeda to drive up to the Suburban. He was the one who instigated the

23

shooting. He was the one who told Almeda to drive up again after his gun jammed the first time. At that point, Chavez had not returned any fire, but Villa shot at him anyway. It was not until after that point that Almeda fired on but missed Chavez. Villa's statement did not exculpate him or place the blame on Almeda. It was not self-serving and was not made so Villa could curry favor with law enforcement. By placing himself and Almeda in Almeda's car and Almeda in the driver's seat, Villa incriminated himself more severely as the instigator and primary force behind the murder.

Villa's statement that Almeda shot at the Suburban also was admissible because it was against his penal interest and was not self-exculpatory. Villa told Almeda to shoot at Chavez before Almeda actually fired. No reasonable person attempting to exculpate himself would admit he fired a volley of shots, directed Almeda to drive up on the SUV again, fired a second volley of shots, and then, when his gun jammed a second time, told Almeda to shoot, and Almeda complied with his command. All of Villa's statements naming Almeda were against Villa's interest.

After concluding Villa's statements were against penal interest, the trial court also did not abuse its discretion in finding Rhodes's testimony of Villa's statements was trustworthy. " 'To determine whether [a particular] declaration [against penal interest] passes [section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." ' (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.) We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' (*People v. Frierson* (1991) 53 Cal.3d 730, 745.)" (*Duarte, supra,* 24 Cal.4th at p. 614.)

Villa's statements were sufficiently reliable to warrant admission despite their hearsay character. Villa did not exculpate himself at all in his statements. He did not

24

minimize his role in the killing or try to push blame off of him and onto Almeda. He made the statements to his cellmate while in jail. The two had become acquainted, and Villa opened up to him. If he intended for someone inside the jail to hear him exculpate himself, he said the wrong things.

Another indicator of the statements' reliability is they gave law enforcement significant details about the crime they did not have at the time. The investigator who interviewed Rhodes testified he learned key pieces of information he had not known until he met with Rhodes, and he followed up on those items. He learned the second gun used in the homicide was a .357 magnum. He learned Villa used the same gun in the homicide as he did in the shooting the day before. At that point, the investigator had not received the crime lab's analysis on the various bullets and casings found at the two crime scenes, and nothing had linked the two crimes to Villa.

The investigator also confirmed there had been a drive-by shooting at Almeda's house and his neighbor's house. That information was not contained in any reports filed on the Chavez homicide.

The investigator verified other statements Rhodes made. He verified (1) Villa's grandmother lived near Hiram Johnson High School; (2) Villa's girlfriend lived in an apartment on Florin Road between Stockton Boulevard and Power Inn Road; and (3) the existence and location of the speed bumps near the crime scene, as Villa described them. This undisputed and verifiable evidence sufficiently supported the trial court's conclusion that Villa's statements were trustworthy.

Almeda relies on testimony introduced in his defense to argue the statements were not trustworthy. His mother and grandmother testified the garage door at the grandmother's house was inoperable and had not been opened for 30 years. His mother testified she never saw Almeda the night of the murder. She testified that Almeda was not home when she got home from work. Almeda's mother and her boyfriend had dinner at Almeda's grandmother's house and they then went to the hospital to visit a family

25

member until late that night. Information that a second gun was used was available without Villa's statements, as Jones said in her statement she thought two guns were used. Transcripts of Rhodes's interviews, which the trial court read before ruling on the motion, indicated Rhodes knew Villa had a box of witness statements in the cell and knew some of their contents. He also had unfettered access to them when Villa was out of the cell.

We do not resolve conflicting facts or determine witness credibility. The evidence in support of the ruling is sufficient to support the trial court's decision. Villa implicated himself fully in the shooting. He did not minimize his involvement. He provided facts beyond what police knew and witnesses provided, and many of his facts were subsequently confirmed. Under these circumstances, we conclude the trial court did not abuse its discretion by finding Villa's statements qualified as statements against his penal interest and by admitting them against both defendants.

## II

### *Instructing on Lesser Included Offense*

The trial court denied Villa's request to instruct the jury on voluntary manslaughter heat of passion and imperfect self-defense. Villa contends the court erred, asserting evidence of the lesser offense was substantial enough to merit consideration by the jury. He claims there was evidence a bottle was thrown at Almeda's car, making a loud noise. Believing he was being fired upon, Villa fired back in the heat of passion and in imperfect self-defense. Almeda joins in the argument. We conclude the trial court did not err. There was insufficient evidence to justify instructing on either theory.

"In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) ' "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence

26

that the offense was less than that charged. [Citations.]" ' (*Ibid.*) '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]' (*Id.* at p. 162.)" (*People v. Taylor* (2010) 48 Cal.4th 574, 623, original italics.)

Heat of passion voluntary manslaughter has an objective component and a subjective component. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) To satisfy the objective component, " ' "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.]" (*Ibid*.)

To satisfy the subjective component, the evidence must show the defendant actually, subjectively, killed under the heat of passion. (*People v. Manriquez, supra,* 37 Cal.4th at p. 584.)

There is insufficient evidence Villa objectively and subjectively killed in the heat of passion. The evidence of provocation—a beer bottle thrown at Almeda's car—would not naturally arouse an ordinarily reasonable person to shoot and kill the person who threw the bottle. Moreover, whatever feelings Villa experienced transformed to a premeditated and deliberate intent to kill when, after he jammed his gun, he had the presence of mind to clear the jam, direct Almeda to drive up again onto Chavez's pickup, and resume shooting. Villa's conduct did not support an instruction on heat of passion involuntary manslaughter.

For the same reasons, the evidence was insufficient to support instructing the jury on imperfect self-defense for Villa. Imperfect self-defense requires " '[a]n honest but

27

unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 883.) The doctrine "is 'narrow' and will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " '*must be instantly dealt with.*' " ' [Citation.]" (*Ibid.*, original italics.)

There is no substantial evidence from which the jury could have concluded Villa killed Chavez due to an honest but unreasonable belief he needed to defend himself instantly from an imminent threat to his life. There is no evidence that after Villa's gun jammed, Chavez or Jones made any threat against the defendants. Indeed, it appears Chavez pushed and held Jones down while he tried to get away and save himself and Jones, as his Suburban began moving forward away from defendants. Yet, without any threat against him, Villa ordered Almeda to pull up a second time on the Suburban and again fired into the vehicle, this time fatally wounding Chavez.

The evidence is also insufficient to support a voluntary manslaughter instruction for Almeda. There is no evidence Almeda heard the bottle break or saw or heard anything that would threaten him with death or bodily harm. The Suburban was pulling away, but he pulled up again on the Suburban, and only on Villa's command, and he did not begin shooting until after Villa had fired a second volley of shots, Villa's gun jammed a second time, and Villa directed him to shoot at Chavez. There is no evidence suggesting Almeda at that point objectively acted in the heat of passion or in an honest but unreasonable belief he needed to act instantly to preserve his life.

In short, no evidence indicates either defendant acted in any state of mind after Villa's first round of shots other than with a premeditated and deliberate intent to kill willfully and with malice. The trial court did not err when it refused to instruct on voluntary manslaughter.

28

# III

## *Admission of Uncharged Offense*

Villa contends the trial court abused its discretion when it admitted evidence of his 2009 shooting at an occupied vehicle to show his intent and common scheme and plan in this case. He claims the evidence was irrelevant and unduly prejudicial. We disagree. The evidence was relevant and sufficiently similar to the charged offense to be admitted on the issue of intent, and its probative value substantially outweighed any possible prejudicial effect.

### A. *Background information*

In an in limine motion, the prosecutor asked to introduce evidence of Villa's 2009 shooting at an occupied vehicle. The prosecutor sought to admit the evidence under Evidence Code section 1101, subdivision (b), to show intent and common plan in this case. She planned to call two or three witnesses, and she estimated the testimony would take no more than 45 minutes.

Villa opposed the motion, arguing intent was not at issue and the evidence of the prior act was too dissimilar to establish common scheme or plan in this case.

The trial court granted the motion. Relying on *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*), the court held the evidence was sufficiently similar to the facts of this case to admit it to show intent and common plan and scheme. The evidence was relevant because the prosecution had to prove Villa's intent, and, by showing a common plan, it had a tendency to establish the elements of murder.

The court also held the evidence was not unduly prejudicial under Evidence Code section 352. The evidence was highly probative due to its similarity to the facts of this case. Its probative value was not outweighed by its prejudicial impact because (1) the prior act was fairly recent (it occurred roughly three years before this shooting);

29

(2) admitting the evidence at trial would not take a considerable amount of time; and (3) because Villa was convicted for the prior crime, the jury would be less likely to convict him in this case based on the fact he might not have been convicted in the prior case. The court also minimized the impact by instructing the jury how to consider the evidence.

At trial, before the prosecution introduced the prior uncharged offense evidence, the court instructed the jury about it. The court said the jury could not consider the evidence against Almeda. It told the jury it could consider the evidence against Villa alone and then only if the prosecution proved by a preponderance of the evidence that Villa in fact committed the uncharged offense. If the prosecution met that burden, the jury could consider the evidence in this case only for determining whether Villa acted with the requisite intent or had a plan or scheme on how he committed the two offenses. The jury could not consider the prior crime evidence to conclude Villa had a bad character or was disposed to commit the offenses being tried. The evidence also was not sufficient by itself to prove Villa was guilty of the charged offenses.

Two witnesses testified of the uncharged offense. The first, Dina Calvert, was driving by a tire shop on September 3, 2009, when she noticed a couple of her friends there, including William Klaus, seated inside Klaus's pickup. Calvert also saw Villa drive up and look at Klaus. She knew Villa and recognized the car Villa was driving. Villa stuck his hand out his driver's side and shot at Klaus's truck. Calvert accelerated and noticed Villa had one foot outside his car and the driver's door was open. As she continued driving, she heard more gunshots. In her rearview mirror, she saw Villa drive away.

Sacramento police officer Patrick Mulligan testified he responded to a fire station on September 3, 2009, to check on a person there who had sustained a gunshot wound. The victim had multiple entry wounds similar to having been shot by a pellet gun or a shotgun. He had been a passenger in Klaus's pickup. Officer Mulligan inspected the

30

pickup and found the front windshield on the passenger side and right rear passenger window were shattered. The truck bed and the tailgate also had damage from bullets.

The parties stipulated Villa entered a plea of no contest in 2011 for the 2009 crime and was convicted of violating Penal Code section 246, shooting at an occupied vehicle.

Before the jury began deliberating, the court again instructed it on the limited use and purpose of the 2009 offense evidence.

B.    *Analysis*

Evidence Code section 1101, subdivision (b), authorizes admitting "evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt, supra,* 7 Cal.4th at p. 393, fn. omitted.) As it was here, the evidence may be admitted to establish the defendant's intent and common scheme or plan where "the similarity between the circumstances of the prior acts and the charged offenses supports the inference that defendant committed the charged offenses [with the same intent and] pursuant to the same design or plan defendant used to commit the uncharged misconduct." (*Ibid*.)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. (See *People v. Robbins* [(1988)] 45 Cal.3d 867, 880.) '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 302, p. 241.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' (*People v. Robbins, supra,* 45 Cal.3d 867, 879.)" (*Ewoldt, supra,* 7 Cal.4th at p. 402.)

The trial court did not abuse its discretion admitting the uncharged offense evidence to establish Villa's intent. The prior shooting was sufficiently similar to the present shooting to support the inference that Villa harbored the same intent in each instance. Each time, Villa shot with a gun from a vehicle at persons inside another vehicle.

Villa argues the evidence was not relevant because it had no tendency to prove anything more than what the jury could infer from the evidence of the present shooting. He states the evidence in the current shooting was sufficient for the jury to infer he killed Chavez with malice, premeditation, and deliberation. Because the prior crime evidence could not prove anything more, he claims it was irrelevant.

We reject his argument. By pleading not guilty to first degree murder, Villa put into issue all elements of the charged offense, including intent. (*People v. Carpenter* (1997) 15 Cal.4th 312, 379.) The prosecution therefore was entitled to introduce evidence in order to prove each element of the crime beyond a reasonable doubt, even if Villa did not contest the issue of intent. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243.) Moreover, the prior crime evidence was relevant to show he killed Chavez deliberately and with premeditation. "[T]he doctrine of chances teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous." (*Id.* at p. 1244.)

In addition, we conclude the trial court did not abuse its discretion when it determined the uncharged offense evidence's probative value substantially outweighed its prejudicial effect and thus was not unduly prejudicial under Evidence Code section 352. As the trial court found, Villa was convicted of the prior offense, so the jury was unlikely to feel the need to punish him again for it. The evidence was presented quickly using only two witnesses and a minimum of court time. Moreover, the prior crime was not remote, it was not more inflammatory than the current crime, and it was based on sources independent of the current offense.

Villa contends the prejudicial impact of the uncharged offense evidence substantially outweighed its probative value because it was cumulative of undisputed evidence and showed he had a propensity for violence and shooting a gun at people. As to the latter point, Villa fails to mention and gratuitously assumes the jury disregarded the solemn instructions it received on two occasions not to consider the evidence for propensity. We presume the jury followed the instructions, and there is no evidence suggesting otherwise. (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

The trial court did not abuse its discretion by holding the uncharged offense evidence was not cumulative. " 'Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 669.) Evidence that Villa intentionally shot at people inside a vehicle in 2009 made it more likely he intentionally and with premeditation shot at Chavez in his vehicle.

Because we conclude the uncharged offense evidence was admissible to prove intent, we need not decide whether the court erred admitting the evidence to show a common scheme or plan. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1332-1333.) Because the evidence was admissible and relevant on the issue of intent, the jury would have heard it even if the trial court determined it was not relevant to establish a common plan. Thus any error admitting it for the latter purpose was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

Even if the trial court erred in admitting the evidence for intent, the error remained harmless. As stated already, the evidence against Villa was very strong. Villa admitted to Rhodes he shot at Chavez's truck with a .40-caliber Glock, firing the first volley after something hit the car he was in, and firing a second volley after he unjammed his gun and told Almeda to pull up again alongside Chavez. Jones also identified Villa as one of the persons who shot at her and Chavez. The ballistics information linked the fatal bullet to Villa's gun. It is not reasonably probable Villa would have received a more favorable

33

verdict had the uncharged offense evidence not been admitted. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

IV

*Motion for Severance*

Almeda brought a motion in limine to sever his trial from Villa's or empanel two juries. The trial court denied the motion. It determined most of the witnesses would be called in both trials if they were separated. The evidence against both defendants was quite similar. The court also reasoned there were no inconsistent defenses, as both defendants claimed they were not the perpetrators.

Almeda contends the trial court abused its discretion when it denied the motion to sever. He argues severance was required because admitting Villa's statements through Rhodes's testimony denied him his right to cross-examine a witness whose statements were facially incriminating. He also claims he suffered prejudicial harm because the prosecution proved Villa was involved in two prior shootings from a vehicle, one of which happened the day before the instant offense. And the court did not limit the admissibility of the latter shooting, even though Almeda was not involved with it.

We conclude the trial court did not abuse its discretion. We have already determined the court did not abuse its discretion admitting Villa's statements, so denying the motion to sever on that basis was not an abuse of discretion.

As to the evidence of Villa's prior shooting incidents, the court admitted the 2009 incident but instructed the jury to consider it only as to Villa. We presume the jurors followed that instruction, and severance was not required due to that incident. Almeda also attacks the evidence of Villa's shooting the day before the instant offense, but he failed to object to this evidence or request a limiting instruction. His claim based on that evidence is forfeited. (*In re Carrie W.* (2003) 110 Cal.App.4th 746, 755.)

In his reply brief, Almeda argues for the first time his trial counsel rendered ineffective assistance by not objecting to evidence of the recent shooting or seeking a

34

limiting instruction.  Because Almeda did not present this argument in his opening brief, he has forfeited it.  (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 371, fn. 8.)

V

*Cumulative Error*

Both defendants contend the cumulative impact of errors requires reversal.  We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself.  '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'  (See *People v. Hill* (1998) 17 Cal.4th 800, 844.)  . . .  [C]laims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate."  (*In re Reno* (2012) 55 Cal.4th 428, 483.)

Because we have found no error in each of the defendants' claims, there can be no cumulative error.

DISPOSITION

The judgments are affirmed.


                                        NICHOLSON                , J.*


We concur:



      DUARTE           , Acting P. J.



      HOCH             , J.



---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.