Filed 12/15/22  P. v. W.R. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>W.R.,<br><br>　　　Defendant and Appellant. | B315111<br><br>Los Angeles County<br>Super. Ct. No. PJ53185 |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Brian C. Yep, Judge.  Affirmed.

　　　Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A juvenile court declared W.R. a ward and committed him to a secure youth treatment facility after finding he murdered Bradley Hanaway.  At the hearing to consider the allegations, the court admitted statements that W.R.'s alleged accomplices made to an undercover informant.  On appeal, W.R. argues the statements were inadmissible hearsay and their admission violated his constitutional rights to due process and confrontation.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

The People filed a juvenile wardship petition under Welfare and Institutions Code section 602, alleging W.R. committed first degree murder.  At the adjudication hearing, the People presented evidence showing the following:

Around 1:00 a.m. on January 14, 2019, W.V. was sleeping under the bleachers at Whitsett Park in North Hollywood.  Two or three men woke him and started asking him questions in an El Salvadorian dialect of Spanish.  The men asked W.V. if he was in a gang, and they told him to display his tattoos.  W.V. denied being a gang member and showed the men his tattoos.  The men left, and W.V. went back to sleep.

Around this time, two of the men approached R.G., who was also sleeping in the park.  They asked him if he had crystal meth, and R.G. replied that he did not.

The men then walked over to Bradley Hanaway, who was about five feet from R.G.  They asked Hanaway about his tattoos, and Hanaway lifted up his shirt to reveal them.  The men pointed a light at Hanaway's chest, and within seconds, one of them shot Hanaway.

Hanaway suffered three gunshots wounds:  one to his upper chest, one to his right shoulder, and one to his back.  He died from his injuries.

According to R.G., the person who shot Hanaway was shorter and younger than the other man.  Police showed R.G. photographic lineups of potential suspects.  R.G. identified the taller man as Luis Gonzalez.  He identified the shooter as J.P.

Police arrested J.P. the day after the homicide.  About two weeks later, they arrested Luis Gonzalez and another suspected accomplice, Edwin Martinez.  Both men are members of the Fulton Locos clique of the Mara Salvatrucha gang (M.S.).

Shortly after his arrest, the police placed Gonzalez in a holding cell with an undercover informant as part of a *Perkins*[1] operation.  The informant presented himself as a member of M.S. from a different clique than Gonzalez.  Gonzalez told the informant that, the night of the homicide, Martinez drove him and W.R. to Whitsett Park, which is M.S. territory.[2]  The plan was to go to the park late at night to see if they could find any rival gang members.  Gonzalez implied this was part of his efforts to help W.R. to be accepted into M.S.

Gonzalez and W.R. came across Hanaway in the park, and they made him take off his shirt.  Hanaway had a tattoo on his

---

[1]     *Illinois v. Perkins* (1990) 496 U.S. 292, 297.

[2]      Gonzalez said the shooter's name is "[W.] Ramos."  W.R.'s last name is not Ramos.  However, Gonzalez also referred to the shooter using the same moniker that Martinez used to refer to W.R.

chest, which Gonzalez believed was related to a gang.[3]  Gonzalez said he would keep an eye out while W.R. " 'hit' " Hanaway. By the time Gonzalez said, " '[N]ow,' " W.R. was already pointing a gun at Hanaway.  W.R. shot him three times.  Hanaway ran away, screamed, and then collapsed, as if he "drowned in his own blood."  Gonzalez and W.R. "headed out a different way," and Martinez picked them up in his car.

At some point during the *Perkins* operation, a detective showed Gonzalez a picture of J.P., whom R.G. had identified as the shooter.  Gonzalez told the informant he did not know J.P., and J.P. was not involved in the homicide at Whitsett Park.

After completing the *Perkins* operation with Gonzalez, the police placed Martinez in a cell with the same informant. The informant again claimed to be a member of M.S.  Martinez told the informant "[t]hey killed some fool" at Whitsett Park, but Martinez initially denied being involved.

Sometime later, a police officer showed Martinez photos of W.R. and Gonzalez.  Martinez told the informant "[t]hose are the two guys [who did it]," and he implied that he drove them to the park.  Martinez said he was not concerned because there were no cameras at the park, and W.R. and Gonzalez were "completely covered with their hoodies."  Martinez claimed he "just dropped them off" at the park, and he asked rhetorically, "How could I possibly know what they did there, right?"

The police arrested W.R. based on Gonzalez's and Martinez's statements, and they placed him in a holding cell

---

[3]     Hanaway had a large tattoo on his chest reading "Forever Grateful 818."  The People's gang expert testified that the tattoo was not gang-related, but it could have been mistaken for a tattoo from the 18th Street gang, which is a rival to M.S.

with an undercover police officer. W.R. told the officer he was from "the Mara," and the police had arrested him for a homicide of a homeless person. W.R. believed someone "ratted" him out, otherwise the police would not have found him. W.R. said he would find out in court "who's blabbing" and he would "take care of that sonofabitch."

According to W.R., the homicide involved a gun and happened in a park in his "hood" that he knows "very well." W.R. said the victim was white, "pretty high," and from the 18th Street gang. The agent asked W.R. if he was alone when "it happened." W.R. responded, "[N]o, fool, I was with my homeboy, but he's in jail."

W.R. said he thought about fleeing to El Salvador—where he was from originally—and had been planning to go to another state, but he was waiting until he got "paid." W.R. said he "got to[o] comfy" and lowered his guard before the police arrested him.

The People also presented evidence from a gang expert, who testified that W.R., Gonzalez, and Martinez are members of the Fulton Locos clique of M.S. According to the expert, the Fulton Locos clique considers Whitsett Park to be its territory. The expert explained that, in order to become a member of M.S., a prospect must "put in work," which lately meant the prospect must commit a homicide.

The court found the allegation of first degree murder to be true, and that W.R. acted willfully, deliberately, and with premeditation. The court explained that Gonzalez's and Martinez's statements to the *Perkins* agent supported its findings, but the evidence was not necessary for it to conclude, beyond a reasonable doubt, that W.R. was the shooter. The court declared W.R. a ward and committed him to a secure youth

treatment facility with a baseline term of confinement of seven years.

W.R. timely appealed.

## DISCUSSION

W.R. argues the juvenile court erred by admitting into evidence Gonzalez's and Martinez's statements during the *Perkins* operation that implicated him in the homicide. He contends the statements are hearsay and do not fall within any exceptions to the hearsay rule. He also contends admission of the statements violated his constitutional rights to due process and confrontation.

### 1.  *Proceedings below*

Before the hearing, W.R. and the People filed opposing motions in limine concerning the admissibility of the *Perkins* evidence. The People argued Gonzalez's and Martinez's statements were admissible as nontestimonial declarations against penal interest. W.R., in turn, argued the statements were inadmissible hearsay and their admission would violate his constitutional rights to confrontation and due process.

The court overruled W.R.'s objections, finding the statements qualified as declarations against penal interest. The court explained that the statements were sufficiently trustworthy because they implicated the declarants as aiders and abettors in the crime, both declarants spoke from personal knowledge, the statements were consistent with each other, the declarants believed they were speaking with a fellow gang member, and the statements were descriptions of facts, rather than speculation. The court later admitted transcripts of both *Perkins* operations after Gonzalez and Martinez asserted their Fifth Amendment rights not to testify.

**2.   *The* Perkins *evidence was not inadmissible hearsay; its admission did not violate W.R.'s right to due process***

W.R. argues the juvenile court erred in finding Gonzalez's and Martinez's statements were admissible as statements against penal interest.  Relatedly, he argues the statements were so unreliable that their admission violated his right to due process.

Under Evidence Code section 1230, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."  To gain admission of hearsay evidence under Evidence Code section 1230, " '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' "  (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)  We review a court's admission of hearsay evidence under Evidence Code section 1230 for an abuse of discretion.  (*Grimes*, at p. 711.)

In *Grimes*, our Supreme Court clarified the long-standing rule that Evidence Code section 1230 does not allow the court to admit " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' "  (*Grimes*, *supra*, 1 Cal.5th at p. 713, quoting *People v. Leach* (1975) 15 Cal.3d 419, 441.)  "[*Leach*] explained that those

7

portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests." (*Grimes*, at p. 713.) " '[T]he court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Id.* at p. 711.)

*Grimes* explained that California cases "have taken a contextual approach to the application of the *Leach* rule. We have applied *Leach* to bar admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others. [Citations.] But we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, *supra*, 1 Cal.5th at p. 715.) "[T]he nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Id.* at p. 716.) Noting that "context matters," the court concluded statements that "tended to underscore [the declarant's] responsibility for the crime, rather than diminish it," were admissible as declarations against interest. (*Id.* at p. 717.)

Here, Gonzalez's and Martinez's statements implicating W.R. were inextricably tied to and part of specific statements against their penal interests. Gonzalez essentially admitted to the *Perkins* agent that he directed W.R. to shoot Hanaway, and Martinez admitted being the driver. By doing so, both men implicated themselves in Hanaway's murder as aiders and abettors. Their comments regarding W.R. provided essential context for those admissions by identifying the person they aided and abetted.

Further, the context in which Gonzalez and Martinez made the comments indicates they are reliable. Neither man had an apparent motivation to lie about W.R.'s presence and involvement in the crime. Moreover, both men believed they were speaking with a fellow M.S. gang member. Given the topic of conversation was the murder of a suspected rival gang member in M.S. territory, if anything, one would expect Gonzalez and Martinez to have exaggerated their involvement, rather than to have downplayed it.

W.R. contends Gonzalez's and Martinez's statements were unreliable because both men attempted to downplay their culpability and shift the blame for the homicide. Gonzalez, for example, asserted he was not the shooter and "had just a small part in it." Martinez, moreover, initially denied knowing anything about the homicide, and later insisted he was merely the driver and did not have personal knowledge of what happened in the park.

While it is true that neither man took full responsibility for the homicide, that is largely beside the point given the purpose for which the People used their comments. The primary issue at the hearing was not the respective roles or mental states

of each person involved in the homicide. There was no suggestion, for example, that Gonzalez or Martinez was the shooter, or that W.R. was present but did not possess the requisite mens rea for murder. Instead, it was essentially undisputed that Gonzalez and Martinez were working with an accomplice, and the accomplice committed first degree murder by shooting Hanaway. The primary issue for the juvenile court to decide, therefore, was the identity of the accomplice. That Gonzalez and Martinez denied full responsibility for the homicide does not reflect on the reliability of their identification of W.R. as their accomplice.

Considering all the circumstances, Gonzalez's and Martinez's comments implicating W.R. were clearly against their own interest, such that a reasonable person in their position would not have made them unless he believed them to be true. The juvenile court, therefore, did not abuse its discretion by admitting them into evidence. (See *People v. Smith* (2017) 12 Cal.App.5th 766, 793 [a trial court properly admitted out-of-court statements by a co-defendant because there was "no way in which her statements about being at the scene of the burglary, robbery and murder in which [the declarant] was a relatively lesser participant would make any sense without reference to the major actors"].)

We reject W.R.'s brief suggestion that the juvenile court erred by failing to excise Gonzalez's and Martinez's statements that were collateral to their declarations against interest. After ruling the *Perkins* evidence was generally admissible, the juvenile court informed W.R. it would consider excluding specific statements that were not against the declarants' penal interests. W.R., however, told the court he would prefer that

it consider the entire transcripts of the *Perkins* operations to put the relevant statements in proper context. W.R. cannot now complain that the court erred by doing as he requested. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138–1139 [defendant could not challenge admission of evidence that he introduced at trial].)

We also reject W.R.'s contention that Gonzalez's and Martinez's statements were so unreliable that their admission violated his right to due process. "[T]he state has power to regulate the procedures under which its laws are carried out, and a rule of evidence in this regard 'is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." [Citations.]' " (*People v. Fitch* (1997) 55 Cal.App.4th 172, 178–179.) We have already rejected W.R's arguments that Gonzalez's and Martinez's statements were so unreliable that they failed to satisfy the requirements of Evidence Code section 1230. W.R. offers no compelling reason why the statements were nevertheless so unreliable that their admission violated his right to due process. (See *People v. Dalton* (2019) 7 Cal.5th 166, 209 [rejecting due process argument where evidence was sufficiently reliable to be admitted under Evidence Code section 1230].)

3.    ***Admission of the evidence did not violate W.R.'s constitutional right to confrontation***

W.R. argues admission of Gonzalez's and Martinez's statements violated his federal constitutional right to confront witnesses against him.

The confrontation clause of the Sixth Amendment generally precludes admission of testimonial hearsay against a criminal

11

defendant unless (1) the declarant is unavailable and (2) the defendant had a previous opportunity to cross-examine the witness. (*Crawford v. Washington* (2004) 541 U.S. 36, 68.) The confrontation clause does not preclude admission of nontestimonial hearsay. (*Ibid.*; *People v. Cage* (2007) 40 Cal.4th 965, 984.) "[T]hough a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. . . . [T]he statement [also] must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. . . . [T]he primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Cage*, at p. 984.)

Although the *Perkins* agent plainly received Gonzalez's and Martinez's statements for possible use in a criminal trial, the record does not indicate that either man gave the statements for the same reason. It is apparent from the transcripts that both men believed they were having an informal and private conversation with a fellow gang member. Neither man knew he was speaking with an informant or otherwise anticipated his statements would be used in a later criminal prosecution. The statements, therefore, were nontestimonial, and their admission does not implicate the confrontation clause. (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 ["statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause"]; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68 [statements to a jailhouse

informant were not testimonial because the declarant did not know he was speaking to an informant or that his statements would be used in a prosecution]; *People v. Almeda* (2018) 19 Cal.App.5th 346, 362–363 [statements made unwittingly to a government informant are nontestimonial]; *People v. Washington* (2017) 15 Cal.App.5th 19, 28 [same].)

**4.      *Any error was harmless***

Even if the juvenile court erred by admitting Gonzalez's and Martinez's statements, any error was harmless.  While announcing its findings, the court explicitly stated it did not need to rely on Martinez's or Gonzalez's statements in order to conclude, beyond a reasonable doubt, that W.R. was the shooter. Based on this comment, there is no doubt the court would have found W.R. committed first degree murder had it not admitted the challenged evidence.  Accordingly, any error was harmless under both the state and federal standards.  (See *Chapman v. California* (1967) 386 U.S. 18, 24 [reversal is required unless the error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal is required only if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

W.R. suggests the court's comment does not render the error harmless because, without the challenged statements, there is not enough evidence to sustain a finding of first degree murder. This is essentially a challenge to the sufficiency of the evidence, which we review under the substantial evidence standard. Under that standard, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable,

13

credible, and of solid value—so that any rational trier of fact could find the defendant committed the crime beyond a reasonable doubt. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *In re L.K.* (2011) 199 Cal.App.4th 1438, 1446.) We must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Johnson*, at p. 576; *L.K.*, at p. 1446.)

Even without Gonzalez's and Martinez's statements, there is sufficient evidence that W.R. committed first degree murder. Viewed in the light most favorable to the judgment, W.R. essentially admitted to an undercover police officer that he witnessed the homicide and was somehow involved in it. He also displayed a consciousness of guilt by telling the officer he had planned to flee to another state, someone had "ratted" him out, and he would "take care of" the "sonofabitch" who was "blabbing." (See *People v. Rogers* (2013) 57 Cal.4th 296, 333 [a trier of fact could infer consciousness of guilt from the defendant's efforts to leave the state].)

Although W.R. did not specifically admit he was the shooter, the court reasonably could have inferred it from the other evidence. R.G. told a detective that Gonzalez and another man approached Hanaway, and the other man—who was younger than Gonzalez—was the shooter. It is undisputed that W.R. is younger than Gonzalez. W.R., moreover, matched the physical description of the shooter that R.G. gave to police. While it is true that R.G. identified J.P. as the shooter, there is evidence in the record that J.P. and W.R. share similar features.

There is also sufficient evidence from which the court reasonably could have concluded W.R. acted with express malice,

14

premeditation, and deliberation. The People's gang expert testified that W.R. is a member of M.S., which considers Whitsett Park to be its territory. The expert also testified that Hanaway's chest tattoo is similar to tattoos that signify membership in a rival gang to M.S. Moreover, according to W.V., shortly before the homicide, several men approached him in Whitsett Park, asked if he was in a gang, and ordered him to display his tattoos. R.G. later saw the men approach Hanaway and ask him about his tattoos. Hanaway lifted up his shirt, the men pointed a light at his chest, and within seconds, one of the men shot Hanaway. Considering this evidence in the light most favorable to the People, the juvenile court reasonably could have inferred that W.R. shot Hanaway as part of an effort to rid the park of rival gang members. The evidence is sufficient to prove first degree murder, meaning any error in admitting the *Perkins* evidence was necessarily harmless.

**DISPOSITION**

We affirm the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


RICHARDSON (ANNE K.), J.*

---

\*     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.