Filed 6/27/25  P. v. De La Rocha CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NANCY DE LA ROCHA et al.,<br><br>    Defendants and Appellants. | B336681<br><br>(Los Angeles County<br>Super. Ct. No. BA468865) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant Nancy De La Rocha.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Federico Loza.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Nancy De La Rocha and Edwin Federico Loza appeal the judgments entered following a jury trial in which they were convicted as charged on two counts of first degree murder (Pen. Code,[1] § 187, subd. (a); counts 1 & 2), two counts of willful, deliberate, and premeditated attempted murder (§§ 664/187, subd. (a); counts 3 & 4), and one count of conspiracy to commit murder (§ 182, subd. (a)(1); count 5).[2] The jury further found the special circumstance that appellants committed multiple murders to be true. (§ 190.2, subd. (a)(3); counts 1 & 2.) As to all counts, the jury found true the allegation that a principal personally used and intentionally discharged a firearm which caused death or great bodily injury. (§ 12022.53, subds. (b)–(e)(1).) The court sentenced both appellants to life without the possibility of parole, plus two life terms, plus a term of 25 years to life in state prison.

Appellants De La Rocha and Loza both challenge their judgments on the followings grounds: that the convictions were not supported by substantial evidence, that they were prejudiced by a failure to instruct on a lesser included offense of conspiracy to commit assault with a firearm, and that their trials should have been severed from other defendants' trials. In addition, De La Rocha contends that the trial court erroneously introduced statements made to a police informant, and improperly limited defense counsel's argument and refused a related pinpoint instruction. Loza argues that his due process rights were violated because the informant dissuaded him from obtaining an attorney. Both appellants join in the other's claims and assert that the cumulative effect of errors was prejudicial. We reject appellants' arguments and affirm the judgments.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Codefendant Christian Ivan Macias was charged and found guilty of the same offenses. We affirmed his conviction in *People v. Macias* (Oct. 15, 2024, B333243 [nonpub. opn.].)

2

# FACTUAL BACKGROUND

On May 13, 2018, around 1:15 to 1:30 a.m., M.W., J.S., M.J., and L.U. were walking near Figueroa Street and Manchester Avenue in South Los Angeles. They were each 15 years old. At least three of them were wearing red clothing.

As the group passed an outdoor taco stand, two or three Latino individuals approached from across the street. M.W. testified that they came "from out of nowhere" "straight for" the group. J.S. testified that one of the suspects said "Suwoop Blood," a phrase known to identify Bloods gang members. M.W. was in fear for his life, thinking the individuals wanted to hurt them, and so he told M.J. to "protect" him and his friends. M.J. pulled out what looked like a little pistol—actually, a pellet gun—causing the suspects to run.

Afterward, as the group of teenagers continued down the sidewalk, a silver or black SUV was "creeping" on the other side of the street. It suddenly made a U-turn, accelerated, and pulled up next to them. The driver was a Latin woman who looked like a "cholo," and the car held several male passengers. M.W. could see a gun on the front passenger's lap. The driver told the teenagers to " 'be safe.' " Understanding the statement to be a threat, the boys ran.

Surveillance video from the night of the incident captured the SUV and its occupants. Prior to the encounter with the group of four teenagers, appellant De La Rocha parked and exited her SUV near the taco stand on Figueroa Street. Shortly thereafter, a Black man (with no apparent connection to the victims) argued with De La Rocha and pointed a gun at her. De La Rocha and a male companion reentered the SUV. A few minutes afterward, surveillance video showed Macias running across the street toward the group of teenage boys, and then quickly running back. Video footage also captured appellant Loza and codefendant Macias in or around the SUV. The SUV then drove back and forth in the area of Figueroa Street and Manchester Avenue, frequently changing direction.

3

Surveillance footage showed the SUV stopping near the group of four teenage boys, and the boys then running.  Two victims could be seen falling.  J.S. testified that, as he ran away, he could hear shooting.  One of his friends, who was running beside him, fell to the ground.  J.S. was struck by a bullet in his shoulder.  M.W. testified that, as he ran with his friends toward a freeway underpass, he was hit on the leg, and he saw two of his friends struck by bullets.

Around 1:30 a.m., officers responded to a report of a shooting near Manchester Avenue and Grand Avenue.  One victim, M.J., was found on the ground near a bus bench, and another victim, L.U., was located in a nearby parking lot.  Both M.J. and L.U. died from gunshot wounds.  The other two victims, J.S. and M.W., were found, still alive though injured, near the 110 freeway northbound on-ramp.

Four nine-millimeter caliber shell casings found near the crime scene were determined to be fired from the same gun.  A day or two after the shootings, graffiti with Macias's gang moniker was observed on a wall next to the area where L.U.'s body was found.  The graffiti was not present at the time of the shootings.

Shortly after the shootings, surveillance cameras showed the SUV park in an alley behind a nearby apartment complex where De La Rocha stayed with her mother.  Macias, Loza, and De La Rocha, as well as an unidentified man, were observed exiting or near the vehicle and then walking together down an alley.  One man threw an object into a trash can.  The SUV seen in the surveillance videos had several unique features, including a star pattern on the rims, a chrome roof rack, and aerodynamic headlights, and was determined to match a vehicle owned by De La Rocha.

Following their arrests, an informant was placed in a cell with Macias and then, later, with Loza.  As the informant established a rapport, Macias told him he was "Big K Rooster" from the Little Gangsters clique of the 18th Street gang.  Macias was taken out of the cell to speak with detectives and, when he returned, he told the

4

informant that the detectives had pictures and videos and the images looked like him. Macias then recounted that, on the night of the incident, he saw a group of individuals near Manchester on the other side of the street who said "Suwoop." When he ran across the street toward them, one of them pulled a gun on him and so he backed up and left. Shortly afterward he saw the "homegirl" passing by in her vehicle and he got in the back. "Nancy" was "using" the vehicle, which was "in her name." When they found the victims, Macias "grabbed the burner" and hopped out to shoot. He shot "seven bullets" with a "nine," and was "shooting everybody." He and his "homeboy" then cleaned the vehicle.

When Loza was placed with the informant in a cell, he said that he was from the Little Gangsters clique of "South Central 18." After a detective stopped by and said he wanted to talk to Loza about a shooting near the 110 and Manchester, Loza said to the informant, "Someone talking." He later agreed that "Rooster" could "pinpoint" him if he flipped. Loza explained to the informant that the driver on the night of the incident was a "girl" who has kids, had done a "lot of work," knew "all the politics," and was "down." The victims were four "Blacks" who were Bloods. Loza said that the "shit happened" "out of nowhere" and that he "didn't expect it." He stated that a "gang fool was gonna shoot the homegirl," and that a group of "Blacks" wearing red pulled a gun on Macias. When Macias said, "I wanna bust at them and shit," Loza said, "Let's go." Two victims were "put down" and there were two "attempts." Loza bragged that it was good, "Like Cheerios, my boy," and said that he had a "regular" gun, without an extended clip. Loza further stated that, during the incident, he kept his iPhone off, and, after the incident, he "cleaned all [his] shit."

Officer Yudidt Martinez testified as a gang expert for the prosecution. She explained that 18th Street was one of the most powerful gangs in the United States. The incident occurred in 18th Street territory. The gang protected its territory with violence. If a member of 18th Street was a victim of crime within their own territory

5

they would retaliate because, if they did not, they would show weakness. If a Black man pointed a gun at an 18th Street associate in 18th Street territory, the gang would retaliate by using the same or a greater amount of force, with multiple members involved. Officer Martinez testified that "Suwoop" was a term used by the Bloods, and that an 18th Street gang member could call out the term to determine if somebody in 18th Street territory was a Blood.

With respect to Macias, Martinez testified that he was a self-admitted member of the Los Gangsters clique of 18th Street who was known as Gallo, or Rooster. Macias had numerous 18th Street tattoos and also had recently gotten a "BK" tattoo, which meant "Blood killer" and showed he took credit for killing a Blood. Martinez, who had had numerous contacts with Macias, identified him in a video surveillance clip from the night of the incident.

Officer Martinez opined that Loza, whom she was familiar with and had spoken with, was also an 18th Street gang member. Loza had numerous 18th Street tattoos, as well as a "BK" tattoo which he got following his arrest in the case. Martinez identified Loza in surveillance footage near De La Rocha's SUV on the night of the incident. As for De La Rocha, Martinez met and spoke with her four days prior to the incident, in the same area where De La Rocha parked the SUV following the shooting. Bodycam footage of the earlier encounter showed De La Rocha speaking with Martinez about various 18th Street members from the area whom she associated with, including some she had bailed out of jail. De La Rocha said her "man" was from a different clique of the 18th Street gang. Martinez opined that De La Rocha was an 18th Street gang associate.

## DISCUSSION

### I. Substantial Evidence Supports the Convictions

Both De La Rocha and Loza contend that their convictions on each of the five counts were not supported by substantial evidence.

6

### A. *Applicable standard of review*

In addressing a lack of substantial evidence argument on appeal, " ' "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt." ' [Citation.] ' " 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' [Citation.] When 'there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in the record, that the jury based its verdict on the reasonable ground.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277–278.)

In conducting our analysis, the substantial evidence rule " 'mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. "[I]n determining whether the record is sufficient . . . the appellate court can give credit only to 'substantial['] evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value.' " ' " (*People v. Collins* (2025) 17 Cal.5th 293, 307.) Furthermore, in reviewing the evidence, we do not " 'reevaluate a witness's credibility.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently

improbable, testimony of a single witness is sufficient to support a conviction.' " (*Ibid.*)

**B.**    ***Counts 1 through 4***

De La Rocha and Loza challenge their convictions on counts 1 and 2, for first degree murder, and counts 3 and 4, for willful, deliberate, and premeditated attempted murder, arguing that the convictions are not supported by substantial evidence.

Murder is defined as "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332, citing *People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

De La Rocha and Loza were both tried under a theory of aiding and abetting the murders and attempted murders. (The jury found that Macias personally discharged a firearm.) Our Supreme Court has explained that "an aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' " (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*), quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Establishing aider and abettor liability thus requires three distinct elements of proof:  (1) "a crime committed by the direct perpetrator," (2) "the aider and abettor's . . . knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends," and (3) "conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez*, at p. 1225).

With respect to murder and attempted murder "the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)  An aider and abettor may be "convicted of first degree premeditated murder based on direct aiding and abetting principles." (*People v. Chiu* (2014) 59 Cal.4th 155, 166 [superseded by statute on other grounds, as explained in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3].)  "An

8

aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Chiu*, at p. 167.) As for attempted murder, when "there are multiple possible victims of the attempted murder, the prosecution must establish that defendant intended to kill each victim for each count charged." (*People v. Virgo* (2013) 222 Cal.App.4th 788, 798.)

### 1.     *De La Rocha's convictions*

De La Rocha argues that the evidence was insufficient to prove that she knew Macias intended to kill the four victims and that she intended to assist him in doing so.

"Because intent can seldom be proven by direct evidence, it typically is inferred from the circumstances." (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1025.) In determining whether a defendant intended to aid and abet a crime, relevant factors include the defendant's presence at the scene of the crime, failure to prevent the crime, companionship, and conduct before and after the crime. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.)

Substantial evidence supports the determination that De La Rocha shared Macias's intent to kill, or attempt to kill, the four victims and that she intended to assist him in carrying out the offenses. Shortly before the offenses, a man argued with De La Rocha and pointed a gun at her. Separately, a member of the group of four teenagers—most of whom were wearing red, and whom Macias challenged by yelling "Suwoop"—pointed a gun at Macias, causing him to run. Minutes later, De La Rocha stopped and let Macias and Loza into her SUV. Loza explained that a "gang fool was gonna shoot the homegirl" and how Macias said a group of "Blacks" wearing red pointed

9

a gun at him.  Macias said, "I wanna bust at them and shit," and Loza responded, "Let's go."

The evidence thus shows that Loza and Macias intended to search for the victims and "bust at" them, and that De La Rocha (who was driving the vehicle carrying Loza and Macias) was aware of this retaliatory intent.  Further evidence shows that De La Rocha intended to assist, and did assist, in the killings.  The SUV, driven by De La Rocha, circled around the area, driving back and forth, searching for the victims.  When the victims were spotted, the vehicle made a U-turn, accelerated, and pulled up next to them, demonstrating that De La Rocha targeted the group.  The evidence further demonstrated that De La Rocha knew her passengers were armed:  M.W. saw a gun on the front passenger's lap, and both Macias and Loza said that they had firearms.  De La Rocha then said to the teenagers, " 'Be safe.' "  M.W. said the threat made him feel "there's no other worse," and caused the group to "instantly start[] running" out of fear.  Soon after, Macias hopped out of the SUV and started "shooting everybody."  He shot to kill—each of the four victims was hit by a bullet, and two were killed.

Substantial evidence supports the jury's finding that De La Rocha shared Macias's intent to kill, and attempt to kill, the victims. (See *People v. Nguyen, supra,* 61 Cal.4th at p. 1054; *People v. Glukhoy, supra,* 77 Cal.App.5th at p. 599 [relevant factors in proving intent include presence at the scene of the crime, failure to prevent it, companionship, and conduct before and after].)  She was present at the scene of the crime; indeed, she intentionally transported her confederates to the scene of the shooting.  She did not prevent the crime but rather facilitated it.  Substantial evidence also proved companionship.  The evidence demonstrated that De La Rocha was a gang associate and her companions were gang members, Macias got in the SUV because he saw it was driven by his "homegirl" "Nancy" (De La Rocha's first name), and Loza said that she had done a "lot of work," knew "all the politics," and was "down."  And De La Rocha's conduct

after the shooting—driving her confederates away from the scene, parking in a location where they could wipe down the vehicle and dispose of evidence, and then walking away from the vehicle with her fellow perpetrators—likewise supported the finding of intent.

Arguing that the finding could only have been based on speculation, not substantial evidence, De La Rocha cites to *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 (*Juan H.*), which explained that "a 'reasonable' inference is one that is supported by a chain of logic, rather than . . . mere speculation dressed up in the guise of evidence." (*Id.* at p. 1277.) In *Juan H.*, the defendant, after shots were fired into his trailer, confronted, with his brother, two men with whom they had a history of conflict. After the men said that they knew nothing about the gunshots, the defendant's brother pulled a shotgun and fired twice, killing one victim. (*Id.* at pp. 1266–1267.) In granting a petition for writ of habeas corpus, the Ninth Circuit found that the record contained no evidence that the defendant knew his brother would assault or murder the victims, or any evidence that the defendant intended to assist his brother in doing so. (*Id.* at pp. 1278–1279.)

*Juan H.* is distinguishable. Among other things, the *Juan H.* opinion found lacking support in the record for any conclusion that the defendant left the crime scene in common flight, had a motive for murder, knew that his brother would assault the victims, or that he "intended, through his actions, to assist [the brother] in committing first-degree murder." (408 F.3d at p. 1278.) The evidence in this case is starkly different. Both De La Rocha and Macias had guns pointed at them just prior to the incident, De La Rocha was aware of the plan to murder the victims, she facilitated the plan by targeting the victims, and she drove her confederates as they fled from the crime scene.

De La Rocha argues that different inferences should be drawn from the evidence but fails to recognize the governing standard of review. "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient

11

substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Substantial evidence supported the murder and attempted murder counts, and the jury could reasonably find De La Rocha guilty beyond a reasonable doubt for these offenses.

> 2.    *Loza's convictions*

Loza similarly argues that substantial evidence did not support the findings that he knew Macias intended to kill the victims or that Loza promoted the killings. He asserts that Macias was a lone actor.

As with De La Rocha, substantial evidence reasonably supports the conclusion that Loza did know of Macia's intent, that he shared the intent, and that he assisted in achieving the objective. (See *Perez, supra*, 35 Cal.4th at p. 1225.) Macias was certainly not a lone actor. Loza was present in the SUV with his fellow gang member Macias and his gang associate De La Rocha after both had guns pulled on them and as they searched for the victims in order to retaliate. Loza told the informant that a "gang fool was gonna shoot the homegirl," that a group pointed a gun at Macias, and that the victims were " 'suwooping' in the wrong place." When Macias said, "I wanna bust at them and shit," Loza responded, "Let's go," encouraging (rather than preventing) the shootings. Loza himself carried a gun during the incident and bragged about how the victims were "put down." During the incident he kept his iPhone off, demonstrating that he was aware of the nature of the encounter, and afterward he "cleaned all [his] shit." Following the incident, he was captured on video, still in the presence of his confederates. Later, he got a "BK" tattoo on his right hand, demonstrating that he took credit for killing a Blood gang member.

Substantial evidence thus reasonably demonstrated that Loza shared Macias's intent to kill the four victims. Loza's presence before, during, and after the shootings, his encouragement of the crimes, his companionship with his confederates, and his conduct around the time of the incident, demonstrated that he intended to aid and abet, and did

12

aid and abet, the murders and attempted murders.  (See *People v. Nguyen, supra,* 61 Cal.4th at p. 1054; *People v. Glukhoy, supra,* 77 Cal.App.5th at p. 599.)  Simply because it is possible that different conclusions may have been drawn from the evidence does not warrant reversal.  (*People v. Ewing* (2016) 244 Cal.App.4th 359, 380 ["That the evidence might also reasonably be reconciled with a contrary finding, as defendant argues, does not warrant reversal"].)

B.  *Count 5*

De La Rocha and Loza also argue that their convictions on count 5, for conspiracy to commit murder, is not supported by substantial evidence.

The crime of conspiracy has four elements:  "(1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator."  (*People v. Ware* (2022) 14 Cal.5th 151, 163.)  Mere knowledge and approval of the purpose of the conspiracy is insufficient to support a conviction.  (*Id.* at p. 166.)

The agreement to commit the offense "must often be proved circumstantially."  (*People v. Homick* (2012) 55 Cal.4th 816, 870.)  " ' "The existence of a conspiracy may be inferred from the conduct, *relationship*, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' "  (*Ibid.*)

Substantial evidence supported the conclusion that there was an agreement among the perpetrators, who each had the specific intent and agreed to commit murder, and that overt acts were committed in furtherance of the conspiracy.  The evidence showed that each defendant was a member or associate of the 18th Street gang, and that they had a motive to kill the four victims in retaliation for entering their territory and threatening Macias.  After Macias and Loza entered De La Rocha's SUV, the group discussed how both Macias and De La

13

Rocha had been threatened with guns. When Macias said, "I wanna bust at them and shit," Loza agreed, saying, "Let's go." De La Rocha then furthered the conspiracy, searching for the victims and stopping next to them when she found them, all while knowing that her accomplices had guns. After the shootings occurred, the defendants all fled together. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121 [evidence that defendants were alone together shortly before murder, as well as later conduct, supported conclusion that defendants had specific intent to agree to commit murder].) Moreover, nothing was taken from the victims, indicating the motivation was revenge. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 629.) Given these and the related facts, substantial evidence supported the convictions for conspiracy.

## II.    Claimed Failure to Instruct on Lesser Included Offense

With respect to count 5, the jury was instructed only on conspiracy to commit murder. De La Rocha and Loza both contend that the trial court had a duty to instruct, and failed to instruct, on a lesser included offense of conspiracy to commit assault with a firearm.

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense. "The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence." [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only "[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of" the lesser offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96.) We review de novo whether the trial court improperly failed to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

14

A lesser offense is necessarily included in the charged offense only if it meets either the " 'elements' test" or the " 'accusatory pleading' test." *(People v. Lopez* (1998) 19 Cal.4th 282, 288.) "The elements test is satisfied when ' "all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." ' " (*Ibid.*) The "accusatory pleading test" is satisfied " ' "if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." ' " (*Id.* at pp. 288–289.)

The parties agree that the issue of whether the trial court had a duty to instruct on a lesser included offense of conspiracy to commit assault with a firearm implicates only possible application of the accusatory pleadings test, not the elements test. Case law on the issue of whether conspiracy to commit to assault with a firearm is a lesser included offense of conspiracy to murder under the accusatory pleadings test has mapped several differing paths. *People v. Cook* (2001) 91 Cal.App.4th 910 (*Cook*) concluded that allegations of overt acts in furtherance of a conspiracy to murder—that defendants acquired a gun and shot and killed the victim—provided adequate notice of conspiracy to assault with a firearm as a lesser included offense. (*Id.* at pp. 919–922.*) People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1709, on the other hand, found that "[b]ecause overt acts need not be criminal offenses or even acts committed by the defendant, the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant." (*Id.* at p. 1709, fn. omitted.) *Fenenbock* instead concluded that "it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy." (*Ibid.*) Because the information in *Fenenbock* alleged only that the defendants conspired to commit murder, the panel concluded

that the trial court was not required to instruct on conspiracy of a lesser offense. (*Ibid.*)

More recently, *People v. Cortez* (2018) 24 Cal.App.5th 807 (*Cortez*) agreed with *Cook* "to the extent that the trial court may consider overt act allegations when determining whether sua sponte instruction on a lesser included conspiracy offense is required." (*Cortez*, at p. 820.) *Cortez* disagreed with *Cook,* however, that a lesser included offense of conspiracy to commit assault with a firearm was required by the overt act allegations. (*Cortez,* at p. 820.) The *Cortez* court noted that "the accusatory pleading did not allege that the defendants agreed to commit any crime, other than murder. There were no allegations, even in the overt acts allegations, that the defendants agreed to commit merely an assault." (*Ibid.*) Applying this finding, the court concluded that the overt acts alleged in *Cortez* "did not render defendant's allegedly lesser offenses necessarily included. The description of the conspiratorial agreement to commit murder cannot be fairly read to describe or encompass either conspiracy to commit assault with a firearm or conspiracy to shoot at an inhabited dwelling," and therefore the trial court did not err by not instructing on conspiracy to commit a lesser offense. (*Id.* at p. 821.)

The holding of *Cortez* applies equally well here. The operative information in this case alleged that the defendants "did unlawfully conspire together . . . to commit the crime of murder." This was the only crime that the information alleged the defendants agreed to commit. Of the 15 alleged overt acts, only one touched upon firearm use, stating, "One coconspirator exited the SUV and shot" the victims. The allegations, including the alleged overt acts, therefore did not describe any agreement to commit assault with a firearm. Rather, the only agreement alleged in the information—even considering the totality of the alleged overt acts—was "conspir[ing] together" to commit "murder." As in *Cortez,* this description of the conspiratorial agreement

16

cannot be read to encompass conspiracy to commit assault with a firearm.

Even if there were error, no prejudice is apparent. (See *People v. Rogers* (2006) 39 Cal.4th 826, 867–868 ["The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at pages 836–837].) "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) The jury was instructed that to find appellants guilty of first degree murder, and separately of attempted willful, deliberate, and premeditated murder, appellants had to have the specific intent to kill. The jury found appellants guilty of first degree murder and attempted willful, deliberate, and premeditated murder, thereby necessarily finding that they had the specific intent to kill required for conspiracy to commit murder. Thus, based on the instructions that were given and the jury's verdicts, there is no reasonable likelihood that the jury, if differently instructed on count 5, would have found that appellants conspired to commit only a lesser offense of assault with a firearm.

## III.  Denial of Separate Trials and Admission of Statements Made to the Informant

Next, both Loza and De La Rocha contend that the trial court erred in denying requests for separate trials. Prior to trial, Loza argued that his trial should be severed from Macias's based on claimed antagonistic defenses, while De La Rocha requested that her trial be severed from both Macias's and Loza's due to out-of-court statements they made identifying her as the driver. The trial court declined to sever the trials, and separately overruled objections by De La Rocha to admission of the statements made by Macias and Loza to the informant. Following the verdicts, the trial court denied motions for

17

new trials from both appellants in which they argued, among other things, that the trials should have been severed.

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." (§ 1098.) "Section 1098 establishes a clear legislative preference for joint trials where . . . multiple defendants are charged with the same crimes against the same victims." (*People v. Gamache* (2010) 48 Cal.4th 347, 381.) The trial court may, however, " 'in its discretion, order separate trials "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.) "We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion." (*People v. Avila* (2006) 38 Cal.4th 491, 575.) "If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*Ibid.*)

The trial court's denial of a motion for new trial is also reviewed " 'under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)

### A.    *Loza's severance claim*

Loza filed a pretrial motion seeking a separate trial from Macias. Loza argued in the motion that his defense at trial would be that Macias, not Loza, was the shooter. He also asserted that Macias would likely claim that Loza was the shooter. These assertions were predicated on statements made to police officers in which both Macias

18

and Loza, following their arrests, blamed the other for the shootings. Loza argued that acceptance by the jury of Macias's defense would necessarily lead to a conviction of Loza, and the trial should be separated due to antagonistic defenses. At the hearing on the matter, Loza's counsel acknowledged that the prosecution stated that it did not intend to introduce the statements made to the officers. Nevertheless, counsel argued that Macias might testify and place the blame on Loza, and that counsel for Macias and Loza were likely to argue that the other defendant was the shooter. The trial court found these stated reasons insufficient to justify severing the trials. Following trial, the trial court denied a motion for new trial in which Loza argued, among other things, that the trials against him and Loza should have been separated.

Mutually antagonistic defenses are not per se prejudicial. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819.) Rather, severance is required for conflicting defenses only when " ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41.) " 'If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1081.) "If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates . . . guilt,' and severance is not required." (*People v. Winbush* (2017) 2 Cal.5th 402, 456.)

We conclude that the trial court did not abuse its discretion in denying Loza's motion for separate trials and his new trial motion. Nor did the trial court's denials result in gross unfairness. Loza was not likely to obtain a better result had the trials been separated.

The case against the defendants was a " ' " 'classic case' " ' for a joint trial, because defendants mutually were charged with the same

19

crimes arising from the same events." (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 150.) The fact that Macias and Loza might attempt to "fix blame on each other did not by itself require separate trials." (*Ibid.*) The conflict between Loza and Macias at trial was relatively minimal, given that the statements made to the police in which each blamed the other were not introduced, and neither defendant testified. While it is true that, during closing argument, counsel for each defendant appeared to blame the other defendant for the shooting, it is not probable that this argument alone led the jury to believe that both were guilty. (See *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 41.)

Instead, in this case there existed "sufficient independent evidence" establishing Loza's guilt. (*People v. Winbush, supra,* 2 Cal.5th at p. 456.) As detailed above, among other evidence, the video surveillance placed him at the scene of the crime and later fleeing with his accomplices. As Loza told the informant, he responded, "Let's go" to Macias's statement that "I wanna bust at them and shit." Loza stated that he carried a gun during the incident and bragged about how the victims were "put down." And after the incident, he got a "BK" tattoo on his right hand.

Loza was tried under a theory of aiding and abetting the murders and attempted murders, while the jury found that Macias personally discharged a firearm. The jury's verdicts were not likely compelled by Loza and Macias having antagonistic defenses. Rather, the jury's findings that Macias was the defendant who pulled the trigger, and that Loza aided and abetted the offenses, were compelled by the evidence itself. Loza thus fails to demonstrate that the trial court abused its discretion, or that reversal is otherwise warranted.

**B.** ***De La Rocha's claims regarding statements made to the informant***

Prior to trial, De La Rocha filed a motion for severance, seeking a separate trial from both codefendants. The motion was based on the

ground that the prosecution would introduce out-of-court statements by Macias and Loza identifying her as the driver. Later, following trial, De La Rocha filed a motion for new trial, arguing, among other things, that a separate trial should have been ordered. The motion was based, in part, on two new grounds—that severance should have been granted because of antagonistic defenses, and that severance should have been granted to prevent introduction of certain gang evidence.

De La Rocha repeats these arguments on appeal. The record shows, however, that De La Rocha, upon her counsel's request, took the initial motion off calendar and never pressed for a pretrial ruling on the issue. Further, she did not raise the latter two grounds until after trial. Although we could properly find the first severance claim forfeited (see *People v. Pinholster* (1992) 1 Cal.4th 865, 931), we elect to address it, in part because De La Rocha separately challenged admission of the statements to the informant, and we herein address her argument regarding that issue.

With respect to the latter two issues, though—severance based on antagonistic defenses and introduction of gang evidence—De La Rocha clearly forfeited these claims. (*People v. Tran* (2022) 13 Cal.5th 1169, 1197 [declining to address issue because appellant forfeited challenge by not "mov[ing] for severance" on stated ground]; see also *People v. Pinholster, supra*, 1 Cal.4th at p. 931; *People v. Salas* (1972) 7 Cal.3d 812, 817; *People v. Simon* (2001) 25 Cal.4th 1082; 1103.) The record demonstrates that, prior to trial, De La Rocha was aware of the possibility of what she claims were antagonistic defenses and the likelihood of the introduction of gang evidence but did not move for severance on these grounds, giving us no cause to address them on appeal.

Returning to the first ground, De La Rocha argues that severance of trials was necessary because the statements made by Loza and Macias to the jailhouse informant, in which they identified De La Rocha as the driver, were inadmissible against her. Separately, De La

Rocha argues that—regardless of the issue of severance—the statements were insufficiently trustworthy to be admitted against her, and admission of the statements deprived her of her rights to confrontation and due process.[3]  Because we find that the statements were properly admitted, we reject these contentions.

        1.  *The statements to the informant were properly admitted*

        Generally, under the *Aranda/Bruton* doctrine, a defendant's Sixth Amendment right to confrontation is violated if, during a joint trial, the trial court admits a codefendant's out-of-court statement implicating the defendant, unless the codefendant testifies and is subject to cross-examination.  (*People v. Capistrano* (2014) 59 Cal.4th 830, 869 [overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104]; see generally *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620].)  In *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*), and following opinions, however, the United States Supreme Court narrowed the scope of the right to confrontation to bar only "testimonial" out-of-court statements not subject to cross-examination.  (*Crawford,* at p. 68; see also *Davis v. Washington* (2006) 547 U.S. 813, 824 [126 S.Ct. 2266]; *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [127 S.Ct. 1173].)  A statement is "testimonial" under this standard if it was " 'made with some degree of formality or solemnity,' " and "the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' "  (*People v. Leon* (2015) 61 Cal.4th 569, 603.)  *Crawford* and subsequent United States Supreme Court authority thereby limited the right of confrontation described by the *Aranda/Bruton* doctrine to cover only "testimonial" statements by a codefendant.  (*People v. Tran, supra*, 13 Cal.5th at p. 1195; *People v.*

---

[3] At various stages throughout the pretrial proceedings, De La Rocha made these same arguments in objecting to introduction of the statements.  The arguments are properly raised on appeal.

*Cortez* (2016) 63 Cal.4th 101, 129; *People v. Washington* (2017) 15 Cal.App.5th 19, 29 (*Washington*); *People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)

There is no question that, in this case, the statements made by Loza and Macias to the informant were not testimonial. *Crawford* described " 'testimonial' statements" as including " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (541 U.S. at pp. 51–52.) The court continued: "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (*Id.* at p. 52.) In contrast, it has been repeatedly held that statements made unwittingly to a government informant (as in this case) are not testimonial. (*Davis v. Washington, supra,* 547 U.S. 813 at p. 825, citing *Bourjaily v. United States* (1987) 483 U.S. 171, 181–184 [107 S.Ct. 2775, 97 L.Ed.2d 1447]; *People v. Almeda* (2018) 19 Cal.App.5th 346, 362–363 (*Almeda*); *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67–68; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401–1402 (*Arauz*).) De La Rocha criticizes this authority and attempts to distinguish it, but these efforts are unavailing. In the end, "[t]he last thing" Loza and Macias "expected was for [their] statement[s] to be repeated in court," and thus the statements cannot be considered testimonial. (*Arauz, supra*, at p. 1402.) Further, the fact that the informant may have received some information from police regarding the operation does not change the nature of the nontestimonial statements. (*Ibid.*) The admission of the statements therefore did not violate De La Rocha's right to confrontation.

Nor did admission of the statements violate De La Rocha's due process rights. In *Washington, supra*, we rejected a similar argument that due process provided an alternative ground for challenging admission of nontestimonial statements by a codefendant, declining to "breathe life back into the *Aranda/Bruton* doctrine when the

codefendant's confession is nontestimonial." (15 Cal.App.5th at p. 30.) Among other reasons for so concluding, we found no basis for construing the broader guarantees of due process to prohibit what the more specific constitutional guarantee of confrontation permits. (*Ibid*.) Moreover, pertinent to our discussion below regarding the trustworthiness of the statements, De La Rocha fails to demonstrate that admission of the statements was so unreliable as to be fundamentally unfair. (See *People v. Dalton* (2019) 7 Cal.5th 166, 209; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

In arguing that Macias's and Loza's statements to the informant should not have been admitted into evidence, De La Rocha contends that the statements were insufficiently trustworthy to be admitted as declarations against penal interest. (Evid. Code, § 1230.) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.) In a situation like this, where the declarants are unavailable to testify, "[t]o be admissible, the out-of-court statement must be trustworthy and against the declarant's penal interest." (*Arauz, supra,* 210 Cal.App.4th at p. 1400.) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.) "[S]tatements by a nontestifying codefendant that implicate the defendant, even by name, may be admissible if they are disserving to the codefendant's interest and are not exculpatory, self-serving, or collateral." (*Almeda, supra,* 19 Cal.App.5th at p. 364.)

De La Rocha asserts that Loza's and Macia's statements lacked trustworthiness because they were made by suspects who were both 19 years old to a purported gang member inmate in his 30's. She contends

that the suspects, in speaking with the informant, might have been anxious and wanting to demonstrate toughness or bravado. These speculative conjectures do not demonstrate that the trial court erred in finding the statements sufficiently trustworthy. As in *Arauz, supra*, comments in which a codefendant implicated himself in statements to an informant showed " 'trustworthiness' " and were " 'specifically disserving.' " (210 Cal.App.4th at p. 1401.) Both Loza and Macias told the informant that they were directly involved in the shooting, and recounted what happened before and after the incident. They related numerous specific details, many of which were corroborated by the surveillance footage and the other's statement. Their statements identifying the other defendants as 18th Street gang members or associates were also corroborated by further evidence. Moreover, neither attempted to exculpate himself or place the blame on another, providing ample support for the finding that the statements were trustworthy. (See *Almeda, supra,* 19 Cal.App.5th at p. 366.)

De La Rocha avers that Loza's statement to the informant was unreliable because Loza took credit for the murders. Loza did not actually tell the informant, however, that he personally shot the victims. Rather, when the informant asked, "How many you put down, though?" Loza responded "two" and there were two "attempts." He also said that he had a "regular" gun, without an extended clip. While these statements could be understood to mean that Loza was taking credit for personally shooting the victims, they could also reasonably be understood to indicate that Loza was part of the group that shot the victims and that he carried a gun while doing so, consistent with the prosecution's case that he aided and abetted the offenses, and the jury's verdicts. In any event, "We do not resolve conflicting facts or determine witness credibility" in determining whether a statement is sufficiently trustworthy to be admitted as a declaration against penal interest. (*Almeda, supra,* 19 Cal.App.5th at p. 368.)

25

We accordingly conclude that the trial court did not err in admitting the statements made by Loza and Macias to the informant.

### 2. *No basis for severance*

De La Rocha further contends that her trial should have been severed from her codefendants' because the statements they made to the informant were inadmissible. Because we conclude that the trial court properly ruled that the statements were admissible, De La Rocha's severance argument fails. (See *People v. Avila, supra,* 38 Cal.4th at p. 575 [appellate court reviews denial of severance motion based on facts at time of ruling].) Nor is any gross unfairness apparent, given that the statements were properly introduced.

## IV. De La Rocha's Contentions re Denial of a Pinpoint Instruction and Sustained Objection During Closing Argument

De La Rocha next argues, on an individual basis, that the trial court erred by refusing to give a pinpoint instruction, initially requested by Loza's counsel, that one defendant could not compel the testimony of another. De La Rocha additionally contends that the trial court erred by sustaining an objection to a statement made by her attorney during closing argument that she could not force Loza and Macias to testify, as counsel wished to emphasize that the jurors should consider the statements made to the informant with caution because the statements were untested through cross-examination. We address these arguments in turn.

### A. *Denial of pinpoint instruction*

During discussions regarding jury instructions, counsel for Loza requested a pinpoint instruction stating that one defendant could not compel the testimony of another. Counsel requested that the instruction be given by adding language to CALCRIM No. 358.[4]

---

[4] CALCRIM No. 358 pertains to an out-of-court statement made by a defendant. The instruction given in this case read: "You have heard evidence that defendants Christian Macias and Edwin Loza made oral statements before the trial. You must decide whether a

26

Counsel for De La Rocha joined in the request. The trial court denied the request, finding, in part, that the requested instruction was "not something that is required."

De La Rocha argues that the trial court erred by declining to amend CALCRIM No. 358 as requested. In support of her argument, she cites to *People v. Duke* (1999) 74 Cal.App.4th 23 (*Duke*), in which the appellate court found that admission of out-of-court statements implicating the defendant, made by a codefendant, did not violate the right to confrontation since they fell under the " 'residual trustworthiness test' " as containing "particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to their reliability." (*Id.* at pp. 29–31.) In dicta, the *Duke* court noted that, in addition to the statements meeting the residual trustworthiness test, "[a]dded to the mix," "the trial court instructed the jury that it could consider the fact that [the defendant] was not able to cross-examine [the codefendant] about his statements in assessing those statements, thus taking some of the sting out of the trial court's ruling." (*Id.* at pp. 31–32.)

*Duke* does not lead us to conclude that the trial court in this case should have expressly instructed that one defendant could not compel the testimony of another. First, *Duke* appears to have little, if any, relevance post-*Crawford*, as the residual trustworthiness test utilized in *Duke* was abandoned in *Crawford* in favor of the rule that Confrontation Clause limitations apply only to testimonial out-of-court statements. (*Crawford, supra,* 541 U.S. at pp. 60, 68.) The *Duke* court's observation that the instruction took "some of the sting out of the trial court's ruling" (*Duke, supra*, 74 Cal.App.4th at pp. 31–32) was

_____

defendant made any such statement in whole or in part. If you decide that the defendant made such a statement, consider the statement along with all the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statement."

made in the context of a now abrogated test, in which the admissibility of the out-of-court statements was more uncertain.  Second, even under the standard that applied at the time, an instruction that a codefendant could not be forced to testify was not required.  At the most, *Duke* noted that the instruction was helpful in that case, but it did not purport to dictate that a similar instruction be given in other cases.  (*Ibid.*)

 " '[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].'  [Citation.]  Instructions that highlight specific evidence, or invite the jury to draw inferences favorable to one side, are considered argumentative and generally should not be given." (*People v. Bell* (2019) 7 Cal.5th 70, 107.)  Here, given that there was no requirement that the requested instruction be given, the trial court acted within its discretion in refusing the request.  The requested instruction could have led the jury to improperly infer that the out-of-court statements by Macias and Loza were untrustworthy because the statements were not subject to cross-examination.

 In an analogous context, our Supreme Court found that the trial court was not required to instruct the jury to view an accomplice's out-court-statements with caution, or to require corroboration, when the statements were declarations against penal interest.  (*People v. Brown* (2003) 31 Cal.4th 518, 556.)  That was because the statements were "made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule." (*Ibid.*)  Just so here. As explained above, the statements by Macias and Loza to the informant were declarations against penal interest.  No instruction regarding inability to call the codefendants to testify was required, and the trial court did not err in denying the requested amendment to the instruction.

**B.** *Objections during closing argument*

De La Rocha continues that the trial court erred by limiting her counsel's closing argument. During a lengthy closing argument, De La Rocha's attorney discussed the statements made by Macias and Loza to the informant and noted that the statements were admissible and might be used against De La Rocha. The following exchange before the jury then took place:

> *De La Rocha's attorney*: Now, one of the basic tenets of the American criminal justice is the opportunity to cross-examine the witnesses against you. I didn't have the opportunity to do that. We can't do that. I can't compel Mr. Loza or Mr. Macias to get up on the witness stand because every criminal defendant deserves the right to remain silent. No one can force them to get up on the witness stand. Well, then we're left with a situation where—
> *Prosecution*: Your honor, this is improper argument.
> *The court*: Yes, I agree.
> *De La Rocha's attorney*: The statements that these two guys made were untested. They are just simply recordings of them talking to *Perkins* agents without Ms. De La Rocha being able to test them.
> *Prosecution*: Same objections, your honor.
> *The Court*: Well, that objection is overruled.
> *De La Rocha's attorney*: I ask that you consider their statements in that vein.

Later during closing argument, after De La Rocha's attorney stated, "I ask that you consider the fact that they are hearsay declarants, and you use that to assess the credibility of whether or not they should be used against Ms. De La Rocha," the trial court again overruled an objection by the prosecution that it was "improper argument."

29

De La Rocha asserts that she was prejudiced by the trial court's sustaining of the objection to the statement that Macias and Loza could not be forced to take the witness stand. A review of the relevant proceedings themselves demonstrates that there was no prejudice. It appears that De La Rocha's attorney said what she wished to say. Although the trial court sustained a single objection, it did not instruct the jury to disregard the argument. Furthermore, De La Rocha's attorney continued with her argument, noting that the statements were untested and asking the jury to consider the statements "in that vein." The trial court overruled an objection to that argument. Later, the attorney asked the jury to consider that the statements were hearsay and use that to assess the credibility of the statements against De La Rocha, to which the trial court again overruled an objection. It is unclear what additional, substantive information counsel might have imparted. Counsel argued to the trial court during a break in proceedings that "because the statements of the codefendants were untested through cross-examination that the jurors should view it with caution," but that message was already effectively communicated by counsel to the jury. Thus, if there had been error in the sustaining of the single objection, it was harmless.

Regardless, De La Rocha does not demonstrate error. As noted above, the fact that the out-of-court statements were not tested by cross-examination had no legal effect on the reliability of the statements. (See *People v. Brown, supra*, 31 Cal.4th at p. 556.)

## V. Loza's Contention that the Informant Dissuaded Him From Obtaining Counsel

Loza argues that his due process rights were violated because, while speaking with the informant, the informant purportedly discouraged him from consulting counsel. Loza contends: "While the Supreme Court determined in *Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394 (*Perkins*)] that, as a general matter, conversations between a suspect and undercover agents do not implicate *Miranda*

[*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694 (*Miranda*)]] concerns, that holding did not extend to efforts by an agent to precondition a suspect to waive his right to counsel or otherwise discourage a suspect from consulting an attorney."

Loza bases his contention that the informant discouraged him from seeking counsel on the following exchange:

*Loza*:  So if I'm here, I can't—I can't have a lawyer?

*Informant*:  Yeah, you can. You're entitled to everything, my boy. You can do that.  But you do that, it's like, you know, you just wanna talk some shit, and they're not gonna tell you nothing.  All right.  Fuck it.

*Loza*:  Oh, okay.  Okay.  Okay.

*Informant*:  Not telling you what to do, my boy, you know, you're—

*Loza*:  Yeah.

*Informant*:  entitled to do what you want, my boy.

*Loza*:  Yeah.

*Informant*:  Just a little heads up, you know?

*Loza*:  Yeah.

*Informant*:  But at the same time, it's, like, if you want, fucken, these fools fucken tell you something.

*Loza*:  Oh, yeah.

*Informant*: You know?  You could let them run their mouth. That's what—I mean, I'm telling you from my personal experience.  Like, with me, it's, like, I've done—I remember the first time I did that shit, and it was, like, bye.  Oh, I ended up in prison and shit. You know?

*Loza*:  Oh, I'll ask—I'll ask for—

*Informant*:  Yeah.

*Loza*:  You know? I think go like that.

31

Loza argues that he was prejudiced because, during their conversation, the informant essentially became a "trusted advisor," and, after the informant made his comments regarding attorneys, Loza made some (but not all) of the statements implicating himself in the offenses. Loza implies, but does not actually claim, that if it were not for the informant's statements regarding attorneys, he may have consulted an attorney instead of continuing to discuss his role in the crimes.

We conclude that Loza forfeited his claim that his due process rights were violated by the informant's statements regarding obtaining a lawyer. In *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*), we addressed a similar due process claim. The defendant in *Orozco* confessed to killing his infant daughter while speaking privately with the child's mother in a meeting that was orchestrated by police and occurred after the defendant had been questioned by police and asked for a lawyer. On appeal, the defendant argued that his confession should have been suppressed as obtained in violation of due process. We determined that the argument had been forfeited because the defendant failed to make a due process-based objection in the trial court. (*Id.* at p. 819.) Likewise, in this case, Loza did not object to introduction of the statement to the informant on due process grounds. He accordingly forfeited a due process challenge on appeal.

In any event, even if the issue were properly raised, Loza fails to establish a due process violation. In constructing his argument that he was unfairly influenced by the informant, Loza relies, in part, on *Miranda. Miranda,* however, only applies when the suspect is subject to "custodial interrogation." (*Miranda, supra*, 384 U.S. at p. 444.) As we noted in *Orozco*, "For purposes of *Miranda*, 'interrogation' means 'express questioning' or 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.' (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 [64 L.Ed.2d 297, 100 S.Ct. 1682].)" (*Orozco, supra,* 32

Cal.App.5th at p. 813.) Accordingly, "[i]mplicit in the definition of 'interrogation' is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that he is talking to the police or one of their agents." (*Orozco,* at p. 813.) "Conversely, there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Id.* at p. 814; see also *Perkins, supra,* 496 U.S. at p. 297 ["the danger of coercion results from the interaction of custody and official interrogation"].) Thus, to the extent that Loza bases his argument on a claimed *Miranda* violation, the argument fails. (*Perkins,* at p. 297 ["We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent"].)

Although Loza acknowledges that he did not know that the informant was an agent of the police, he nevertheless argues that the statements he made to the informant following the conversation about attorneys were involuntary and the product of coercion. "Involuntary statements to police are inadmissible for all purposes." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 20.) "Statements are involuntary when they are not the product of ' " 'a rational intellect and free will.' " ' " (*Ibid.*) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions." (*People v. Maury* (2003) 30 Cal.4th 342, 404.) We consider the totality of the circumstances in determining whether a confession was involuntary. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.)

Loza contends that the facts in this case are similar to those in *Collazo v. Estelle* (9th Cir. 1991) 940 F.2d 411, 414–417, in which the Ninth Circuit held that a police officer resorted to coercive tactics in effectively telling the defendant that he would be penalized if he did not waive his prior invocation of his *Miranda* rights. The facts in this case are not similar to *Collazo*. Loza was not coerced by a police officer to waive his *Miranda* rights. Loza argues that the holding of *Collazo*

should nevertheless still apply because the informant was an agent of the police. *Perkins* and like authority dictate otherwise. "Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist." (*Perkins, supra,* 496 U.S. at p. 297.)

Loza argues that this court should effectively expand *Perkins* and find that the police abused their authority by coordinating with the informant to convince Loza not to invoke his right to counsel. We see no reason to do so. To the extent the police coordinated with the informant regarding his comments about attorneys, "[t]he officers' behind-the-scenes manipulation is, at most, a form of deception, but ' "[p]olice trickery . . . does not, by itself, render a confession involuntary." ' " (*Orozco, supra,* 32 Cal.App.5th at p. 819.)

Moreover, the premise of Loza's argument—that he might have stopped speaking about his role in the offenses if not for the informant's comments—is too speculative to support his challenge. "[T]here must be a *proximate* causal connection between the deception or subterfuge and the confession." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.) The informant's comments did not cause Loza to admit to the crimes. Loza simply asked the informant whether he could have a lawyer and the informant responded. Although the informant's comments could be understood as a suggestion not to ask for an attorney, the informant also told Loza he was "Not telling you what to do, my boy." In any event, there is no indication that Loza may have intended to ask for an attorney immediately and stop speaking with the informant if not for the informant's comments, regardless of the informant's stated view on attorneys. More germanely, the comments were not of a type that would compel Loza to suddenly tell the informant that he was involved in the shootings. The comments did

34

not overcome Loza's " ' " 'rational intellect and free will.' " ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

Accordingly, Loza fails to demonstrate that his subsequent statements to the informant were involuntary or that his due process rights were otherwise violated.

## VI.   Cumulative Error Claims

Finally, De La Rocha and Loza argue that the asserted combined errors deprived them of a fair trial.  Because we have rejected appellants' contentions regarding their various claims of error, we likewise reject their cumulative error argument.  (*People v. Homick, supra,* 55 Cal.4th at p. 869.)

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

35